## STATE OF CONNECTICUT *v.* JORGE RAMOS
(SC 16318)

Borden, Katz, Palmer, Vertefeuille and Zarella, Js.

---

Argued April 17—officially released July 30, 2002

*Adele V. Patterson*, assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Donna Mambrino* and *Sandra L. Tullius*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

KATZ, J. The defendant, Jorge Ramos, appeals from the judgment of conviction, rendered after a jury trial, of two counts of murder in violation of General Statutes § 53a-54a,[1] one count of capital felony in violation of

---

[1] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

General Statutes § 53a-54b (8),[2] and one count of accessory to commit assault in the first degree in violation of General Statutes §§ 53a-8 (a) and 53a-59 (a) (5).[3] The trial court rendered judgment in accordance with the jury verdict[4] and the defendant appealed directly to this court pursuant to General Statutes § 51-199 (b).[5] The defendant claims on appeal that the trial court improperly: (1) instructed the jury concerning the initial aggressor and provocation exceptions to self-defense; and (2) excluded certain testimony relating to street gangs, which the defendant offered to support his claim of self-defense. We reject the defendant's claims and affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On August 14, 1995, an altercation took place on

---

[2] General Statutes § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of any of the following . . . (8) murder of two or more persons at the same time or in the course of a single transaction . . . ."

[3] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm."

[4] The trial court initially sentenced the defendant to fifty-five years imprisonment for his conviction on the first count of murder, and fifty years imprisonment for his conviction on the second count of murder, a term of life imprisonment without the possibility of release for his conviction of capital felony, and five years imprisonment for his conviction of accessory to commit assault in the first degree. The trial court merged the murder convictions into the capital felony conviction, and sentenced the defendant to a total effective sentence of life imprisonment without the possibility of release, plus five years imprisonment.

[5] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

School Street in Hartford between the defendant and his friend, German Montanez, on the one hand, and approximately eight other people, on the other hand. During the altercation, the defendant shot Angel Arce, Robert Brown and David Arce, Angel Arce's brother. Angel Arce and Brown died at the scene from their wounds; David Arce sustained injuries to his buttocks, but survived.

The altercation began at approximately 9 p.m., when David Arce left an apartment on School Street, where he had been eating dinner with some friends, including Randy Medina. As David Arce left the apartment, he exchanged "hard" looks and words with Montanez, who was standing with the defendant outside the building across the street at 37–39 School Street. Animosity between the two stemmed from the fact that Montanez recently had started seeing David Arce's former girlfriend, Glorimel Rosa, who lived at 37–39 School Street. The defendant suggested that Montanez and David Arce go one-on-one in a fistfight to settle their differences. The defendant then showed David Arce a pistol that was in the waistband of his pants. David Arce declined the offer to fight and left the area.

Thereafter, Medina came out of the apartment. The defendant showed Medina the gun and advised him to tell David Arce to "chill out." Medina ran after David Arce to warn him about the defendant's threat. Five minutes later, David Arce returned to 37–39 School Street with approximately seven other people, including Angel Arce, Brown and Medina.

The defendant approached the group at the end of the driveway of the apartment building, holding his pistol in view. The defendant then exchanged words with the group, during which time he shoved and slapped Angel Arce. Pointing his pistol at the group, the defendant began backing up the driveway, toward

the back parking lot of the apartment building. He attempted to fire the gun, but it jammed.

As the group continued toward the back parking lot, Montanez ran into the apartment building to retrieve a 9 millimeter pistol. Thereafter, Montanez emerged from the back porch of the apartment building, and began firing his gun at the group. The defendant started shooting at the group as well, hitting Angel Arce once in the chest and hitting Brown in the arm, back and chest, killing them both.[6] David Arce was shot in the buttocks, but survived the incident.

At trial, the defendant claimed that he had acted in self-defense, pursuant to General Statutes § 53a-19,[7]

---

[6] Ballistics evidence introduced at trial confirmed that a .38 caliber bullet, the caliber of the gun used by the defendant, caused the fatal wounds to Angel Arce and Brown.

[7] General Statutes § 53a-19 provides: "(a) Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he is a peace officer or a private person assisting such peace officer at his direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform.

"(c) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical

based on his belief that some of the individuals in the group were gang members. In support of this theory, the defendant sought to introduce evidence relating to the presence of the Latin Kings gang in the neighborhood surrounding School Street. The trial court ruled this evidence inadmissible. Throughout the trial, the state had contended that the defendant was not entitled to assert a claim of self-defense in accordance with § 53a-19 (c) because he had been either the initial aggressor in the incident or the person who had provoked it. See footnote 7 of this opinion. The trial court thereafter instructed the jury that the defendant could not prevail on his theory of self-defense if either of those two exceptions were satisfied. The jury returned a verdict of guilty on all counts and the court thereafter rendered judgment in accordance with the verdict. This appeal followed. Additional facts will be provided as necessary.

I

The defendant claims two improprieties with respect to the trial court's instructions to the jury. First, the defendant claims that the trial court gave an improper instruction with regard to the initial aggressor exception to the justification of self-defense, when it instructed the jury to use the ordinary meaning of the words "aggressor" and "aggression." Second, the defendant contends that the trial court gave a legally incorrect instruction to the jury regarding the provocation exception to self-defense. Specifically, the defendant contends that the instruction failed to inform the jury that the state must prove that, at the time of the provocation, the defendant had the specific intent to harm the eventual victim and not merely any resulting victim. We address each of these claims in turn.

force involved was the product of a combat by agreement not specifically authorized by law."

## A

We first address the defendant's claim that the trial court improperly instructed the jury to use the ordinary, everyday meaning of the words "aggressor" and "aggression," when considering whether the defendant had been the initial aggressor, and, therefore, was not entitled to a claim of self-defense. Specifically, the defendant contends that the trial court should have given a legal definition of these terms following the jury's request for such a definition, and that the failure to do so reasonably could have misled the jury into concluding that the initial aggressor is the first person to use force. Because the victims' behavior consisted only of threatening actions rather than physical contact, the defendant claims that the trial court's instructions reasonably could have led the jury to conclude improperly that he must have been the initial aggressor, defeating his claim of self-defense. The defendant contends, therefore, that the trial court's instructions violated his right to a fair trial under the fourteenth amendment to the United States constitution.[8] We disagree.

The following additional facts are necessary to our resolution of this claim. During closing arguments, the state asserted that the defendant had been the initial aggressor in the altercation.[9] In his request to charge,

---

[8] Section 1 of the fourteenth amendment to the United States constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[9] In his closing argument, the state's attorney stated: "Now, with regard to justification, one of the things that the defense didn't tell you was that the fact that—it is true that the state has the burden of disproving this defense of justification. Well, what the defendant didn't tell you was that the state only has to prove one of these things beyond a reasonable doubt. Only one, ladies and gentlemen. The defendant is the initial aggressor. Of course he is. Of course he is. The defendant is the one who called David [Arce] across the street. He and [Montanez] both called . . . David [Arce]

the defendant submitted a jury instruction on self-defense that included the initial aggressor exception to that defense.[10] The trial court, thereafter, instructed the jury on several exceptions to the justification of self-defense, including the initial aggressor exception. The court's instruction, in essence, mirrored the defendant's request to charge and provided in relevant part: "The initial aggressor is a person who first acts in such a manner that creates a reasonable belief in another person's mind that physical force is about to be used upon that other person or persons. The first person to use physical force is not necessarily the initial aggressor. Before an initial aggressor can use any physical force, the initial aggressor must withdraw or abandon the conflict in such a way that the fact of withdrawal is perceived by his opponent so that the opponent is aware that there is no longer any danger from the original aggression."

On the first day of deliberations, the jury foreperson submitted a written note to the trial court requesting that it provide a legal definition for the words "aggression" and "aggressor." The trial court informed the jury that its research had uncovered no relevant Connecticut

across the street. When David [Arce] gets to the front, it's the defendant who offers to fight. 'You want to fight my boy?·Well, go heads up.' He's the one who gets the ball rolling."

[10] The defendant's request to charge provided in relevant part: "[A] person is not justified in using deadly physical force if he is the initial aggressor and does not withdraw from the encounter.

"The 'initial aggressor' is the person who first acts in such a manner that creates a reasonable belief in another person's mind that physical force is about to be used upon that other person. The first person to use physical force is not necessarily the initial aggressor. It is not necessary for the assailant to have actually struck a blow if it appears an attack is imminent to trigger the doctrine of self-defense.

"If you find that the state has proven beyond a reasonable doubt that the defendant was the initial aggressor, and that the defendant did not effectively withdraw from the encounter or abandon it in such a way that the other person knew he was no longer in any danger from the defendant, you shall then find that the defendant was not justified in using deadly physical force."

authority providing a legal definition for the words. Accordingly, the trial court instructed the jury to use the ordinary meaning of the words.[11]

The defendant concedes that he did not object to the trial court's instruction and, therefore, that this claim is unpreserved. Accordingly, he seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[12] The defendant has satisfied the first two prongs of *Golding* because an adequate record exists and "[a]n improper instruction on a defense, like an improper instruction on an element of an offense, is of constitutional dimension." (Internal quotation marks omitted.) *State* v. *Lemoine*, 256 Conn. 193, 198–99, 770 A.2d 491 (2001). The defendant's claim fails under the third prong of *Golding*, however, because he has not demonstrated that the alleged constitutional violation exists.

We begin our analysis with the following well established principles. "[A] charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case. . . . Therefore,

[11] The trial court, reading and responding to the jury's note, stated: "[P]lease give legal definition of 'aggression' and 'aggressor.' There is no legal definition of those terms. There's no special legal definition of those terms as there was for, say, serious physical injury, physical injury, firearm. You use the everyday, ordinary, regular meaning of those terms."

[12] In *State* v. *Golding*, supra, 213 Conn. 239–40, this court held "that a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances."

[t]he charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Citations omitted; internal quotation marks omitted.) *State* v. *Brown*, 259 Conn. 799, 807, 792 A.2d 86 (2002).

Section 53a-19 (c) provides in relevant part that "a person is not justified in using physical force when . . . (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force . . . ." See footnote 7 of this opinion. The statute does not define the term "initial aggressor."

We have had occasion, however, to address the propriety of jury instructions concerning the initial aggressor exception to self-defense. We have determined that the initial aggressor may be, *but is not necessarily*, the first person to use force. See *State* v. *Prioleau*, 235 Conn. 274, 293, 664 A.2d 743 (1995); *State* v. *Jimenez*, 228 Conn. 335, 340, 636 A.2d 782 (1994). We have explained that interpreting § 53a-19 (c) so that the initial aggressor is the first person to use force would run counter to the statute, when read as a whole, because that section "contemplates that a person may respond with physical force to a reasonably perceived threat of physical force without becoming the initial aggressor and forfeiting the defense of self-defense. Otherwise, in order to avoid being labeled the aggressor, a person would have to stand by meekly and wait until an assail-

ant struck the first blow before responding." *State* v. *Jimenez*, supra, 341. We have determined, therefore, that a trial court instruction indicating that the initial aggressor is the first person to use physical force is incorrect as a matter of law. Id.

In the present case, the defendant concedes that the trial court's charge on the initial aggressor exception to self-defense, in essence, mirrored the charge request he had submitted. The court's charge explicitly instructed the jury that the initial aggressor was not necessarily the first person to use physical force and was, therefore, correct as a matter of law. Moreover, the trial court, subsequent to instructing the jury to use the everyday, ordinary meaning of the words "aggressor" and "aggression," reiterated its previous charge as to the meaning of initial aggressor.

"It is a fundamental principle that jurors are presumed to follow the instructions given by the judge. . . . *State* v. *Smith*, 212 Conn. 593, 599, 563 A.2d 671 (1989); *State* v. *Williams*, 202 Conn. 349, 364, 521 A.2d 150 (1987); *State* v. *Barber*, 173 Conn. 153, 156, 376 A.2d 1108 (1977)." (Internal quotation marks omitted.) *State* v. *Williams*, 258 Conn. 1, 15 n.14, 778 A.2d 186 (2001). We presume in the present case, therefore, in the absence of evidence to the contrary, that the jury followed the trial court's instruction that they were not required to find that the first person to use force was the initial aggressor. Moreover, the jury's note submitted to the trial court reasonably can be interpreted as a request for further elaboration of those terms, and not as an indication that it was disregarding the court's instruction. In essence, the jury's note indicated that it understood what was *not* required in order to be the initial aggressor, namely, a use of force, but that it wanted further clarification as to what *was* required to constitute being an initial aggressor. In the absence of a legal definition, the trial court properly instructed the jury

to use the common, everyday meaning of the terms "aggressor" and "aggression."[13] See General Statutes § 1-1 (a);[14] *State v. Vickers*, 260 Conn. 219, 224, 796 A.2d 502 (2002) (statutory terms given ordinary meaning, unless context indicates different meaning intended). Furthermore, the trial court's instruction in response to the jury's note did not detract from the trial court's initial instruction, which the defendant concedes was proper.

In support of his claim that the trial court's instruction reasonably may have misled the jury, the defendant relies on *State v. Jimenez*, supra, 228 Conn. 335, and *State v. Ash*, 231 Conn. 484, 651 A.2d 247 (1994). This reliance is misplaced. In the present case, the trial court did not improperly instruct the jury that the initial aggressor must be the first person to use force. Cf. *State v. Jimenez*, supra, 340 (instruction indicating initial aggressor was first person to use physical force incorrect as matter of law). Moreover, even if the jurors initially could have been misled by their own interpretation of the terms "aggressor" and "aggression," that misunderstanding would have been corrected by the trial court's final instruction that an initial aggressor does not have to be the first person to use force. Cf. *State v. Ash, supra*, 496 (correct jury instructions, followed by incorrect instructions on recharge, reasonably likely to mislead jury). Accordingly, we conclude that

---

[13] We note that, although the defendant claims that the trial court improperly failed to provide the jury with a *legal* definition for the terms at issue, the defendant has not provided such a legal definition to this court, and our research has revealed no such definition. Moreover, we have stated previously that, even where a statutory definition exists, the trial court is not required necessarily to provide that definition in its instructions to the jury. See *State v. Brown*, supra, 259 Conn. 808–809.

[14] General Statutes § 1-1 (a) provides: "In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly."

the trial court's instruction, when viewed as a whole, did not mislead the jury.

B

We next address the defendant's contention that the trial court improperly instructed the jury as to the provocation exception to the justification of self-defense. Specifically, the defendant claims that the court's instructions failed to explain that, in order to prove provocation, the state was obligated to prove that the defendant, at the time of the provocation, intended to harm the actual victim, and not merely any victim. The defendant contends, therefore, that the trial court's instructions improperly allowed the jury to "mix and match the actual victims with the object of the defendant's intent at the time of the encounter with David [Arce] . . . ." We conclude that the defendant did not preserve this claim and, therefore, we do not reach this issue.

The following additional facts are relevant to our disposition of this issue. The defendant submitted a request to charge to the trial court requesting that the court instruct the jury on self-defense, including the "retreat" and "initial aggressor" exceptions to self-defense under § 53a-19. See footnote 7 of this opinion. Although the defendant did not request an instruction on the provocation exception, the court also instructed the jury on provocation. The defendant did not object to that instruction.

The defendant contends, however, that his claim on appeal regarding the propriety of the jury instruction with regard to the provocation exception has been preserved. The defendant relies on Practice Book § 42-16, which provides in relevant part: "An appellate court shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge or exception

has been taken by the party appealing immediately after the charge is delivered. Counsel taking the exception shall state distinctly the matter objected to and the ground of exception. . . ." This court previously has explained that "[t]he purpose of the rule is to alert the court to any claims of error while there is still an opportunity for correction in order to avoid the economic waste and increased court congestion caused by unnecessary retrials." *State* v. *Packard,* 184 Conn. 258, 281, 439 A.2d 983 (1981); see also *Henderson* v. *Kibbe,* 431 U.S. 145, 154, 97 S. Ct. 1730, 52 L. Ed. 2d 203 (1977) ("[o]rderly procedure requires that the respective adversaries' views as to how the jury should be instructed be presented to the trial judge in time to enable him to deliver an accurate charge and to minimize the risk of committing reversible error").

It is well settled, therefore, that a party may preserve for appeal a claim that an instruction, which was proper to give, was nonetheless defective either by: (1) submitting a written request to charge covering the matter; or (2) taking an exception to the charge as given. See *Pestey* v. *Cushman,* 259 Conn. 345, 372–73, 788 A.2d 496 (2002); *State* v. *George B.,* 258 Conn. 779, 801–802, 785 A.2d 573 (2001); *State* v. *Faria,* 254 Conn. 613, 632–33, 758 A.2d 348 (2000). Moreover, the submission of a request to charge covering the matter at issue preserves a claim that the trial court improperly failed to give an instruction on that matter. See *State* v. *Beltran,* 246 Conn. 268, 273, 717 A.2d 168 (1998); *State* v. *Carter,* 232 Conn. 537, 543, 656 A.2d 657 (1995); see also *State* v. *Brown,* supra, 259 Conn. 799. In each of these instances, the trial court has been put on notice and afforded a timely opportunity to remedy the error. *State* v. *Faria,* supra, 632. It does not follow, however, that a request to charge addressed to the subject matter generally, but which *omits* an instruction on a specific

component, preserves a claim that the trial court's instruction regarding that component was defective.

Applying these principles to the present case, we conclude that the defendant's claim was not preserved. The defendant does not claim that an instruction on the provocation exception to self-defense should not have been given to the jury. Rather, he claims that, although the trial court properly presented the provocation exception to the jury, the instruction was defective. The defendant, however, neither submitted a request to charge on provocation nor took exception to the instruction given. The defendant failed, therefore, to alert the trial court in such a manner as to allow it an opportunity to correct the alleged defective instruction on provocation. See *State* v. *Packard,* supra, 184 Conn. 281. Accordingly, the defendant's claim was not preserved for appellate review.

Nevertheless, a defendant may prevail on an unpreserved claim under *Golding* or the plain error doctrine. See Practice Book § 60-5;[15] *State* v. *Kelly,* 256 Conn. 23, 58 n.18, 770 A.2d 908 (2001); *State* v. *Woods,* 250 Conn. 807, 814–15, 740 A.2d 371 (1999). A party is obligated, however, affirmatively to request review under these doctrines. *State* v. *Waz,* 240 Conn. 365, 371 n.11, 692 A.2d 1217 (1997) ("defendants who seek consideration of unpreserved constitutional claims [on appeal] . . . bear the burden of establishing their entitlement to such review under the guidelines enumerated in *Golding*"). In the present case, the defendant has requested neither *Golding* nor plain error review. We, therefore, decline to review the defendant's claim that the trial court's

---

[15] Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

instruction on provocation was defective.[16] See *Ghant* v. *Commissioner of Correction*, 255 Conn. 1, 17, 761 A.2d 740 (2000) (inappropriate to engage in level of review not requested).

## II

Finally, the defendant claims that the trial court improperly excluded, as irrelevant and outside the scope of direct examination, certain testimony regarding gang membership and gang activity in the School Street vicinity, which the defendant attempted to introduce in support of his theory of self-defense. Specifically, the defendant contends that, on three separate occasions, the trial court improperly excluded testimony that tended to prove his belief that the group advancing toward him included members of the Latin Kings, a local gang, and, as such, that his fear of imminent serious bodily injury or death was reasonable.

The following additional facts are relevant to the resolution of these claims. James Rovella, a Hartford police detective, testified for the state, reading into evidence the defendant's statement to the police, in which the defendant had told Rovella that he believed that the people in the group approaching him at School

---

[16] In certain instances, dictated by the interests of justice, we may, sua sponte, exercise our inherent supervisory power to review an unpreserved claim that has not been raised appropriately under the *Golding* or plain error doctrines. "Appellate courts possess an inherent supervisory authority over the administration of justice. . . . The standards that [are] set under this supervisory authority are not satisfied by observance of those minimal historic safeguards for securing trial by reason which are summarized as due process of law . . . . Rather, the standards are flexible and are to be determined in the interests of justice. . . . [O]ur supervisory authority is not a form of free-floating justice, untethered to legal principle." (Internal quotation marks omitted.) *State* v. *Anderson*, 255 Conn. 425, 438–39, 773 A.2d 287 (2001). In light of our extensive review of the jury instructions that we undertook to address the first issue on appeal, we conclude that the interests of justice do not require that we review the defendant's claim regarding the provocation instruction.

Street were members of the Latin Kings gang. Rovella testified that he found no evidence in the police department database indicating that any of the victims was a Latin Kings gang member. He further testified that the Los Solidos and the Latin Kings were rival gangs in Hartford.

On cross-examination, Rovella testified that the gangs were rivals in 1995. He also testified that members of gangs tend to carry firearms. At one point in the cross-examination, defense counsel asked Rovella: "[A]m I correct that the membership in gangs around [1995] was a fairly fluid concept; that is people would join and get out and join and get out?" The state objected to the question, claiming that it was outside the scope of direct examination and irrelevant. The trial court sustained the objection, noting, however, that the defendant could call Rovella as a defense witness, qualify him as an expert on gangs, and then ask the question on direct examination. The defendant did not do so, but nevertheless challenges on appeal the trial court's restriction of his cross-examination of Rovella.

Just prior to the defendant taking the stand in his own defense, the state filed a motion in limine to exclude as irrelevant any testimony dealing with the subject of gangs and gang related activities. In response, defense counsel presented an oral offer of proof,[17] in which he

---

[17] Defense counsel stated in his offer of proof: "The defendant . . . was in fear for his own safety, in fear of imminent great physical harm and that that was based on the numbers, sizes of the people and also the fact that he had concerns that they were members of the Latin Kings. And he had those concerns because of their numbers and because of the location, which was . . . an area that was habituated at the time by members of the Latin Kings. . . . [T]here's already evidence that he had indicated he had problems with Latin Kings, albeit not these specific people, in the past and he will testify to that and also that, additionally, was concerned because he had been a member of a rival gang, the [Los] Solidos, in the past, was not at the time but had been in the past. And that was one of the reasons for his fear and feeling threatened."

argued that the defendant's testimony was relevant for two reasons: first, that it tended to prove the defendant's subjective fear of imminent harm; and second, that this fear was reasonable. Defense counsel further contended that, because the state had admitted Rovella's report containing the defendant's statements about the Latin Kings, he should be permitted to explore on direct examination of the defendant his impetus for making those statements. Defense counsel conceded, however, that the defendant possessed no personal knowledge that any person in the group was, in fact, a member of the Latin Kings. The trial court thereafter granted the state's motion in limine.

The defendant was permitted to testify, however, that, although at one time he had been a member of the Los Solidos gang, he was not a member at the time of the incident in question. He further testified that he had thought the individuals in the group approaching him on School Street were Latin Kings because that area was well known to be frequented by the Latin Kings gang. Finally, the defendant testified that, after the incident, he had told a friend, Janice Baez, that he had had a fight with some Latin Kings. Additionally, Baez herself testified that, after the incident, the defendant had told her that he had been in a fight with some Latin Kings and that, in the past, the defendant had had problems with members of the Latin Kings gang.

The defendant attempted to call as a witness, Father Lou Paturzo, a pastor at St. Lawrence O'Toole Church in Hartford in 1995. Following the state's objection, Paturzo testified, outside the presence of the jury, that he had been involved in several youth programs and knew both the defendant and David Arce. Paturzo testified that the Latin Kings were active in the School Street area of Hartford and that by 1995, most gang members no longer wore "colors," due to the fact that such identifying marks invited unwanted attention from the police.

He also testified about the violent tendencies of gang members, as well as their tendency to carry firearms.

The defendant contended that Paturzo's testimony would tend to establish the defendant's state of mind at the time of the shooting, namely, that he reasonably believed that the members of the group may have been Latin Kings and, therefore, that they likely would be armed. The state claimed that Paturzo's testimony was irrelevant. Specifically, the state contended that Paturzo's testimony did not indicate that the defendant had specific knowledge that any of the victims was a Latin King. The trial court ruled that Paturzo's testimony should be excluded on the ground that it was irrelevant and prejudicial.

## A

Before addressing the merits of the defendant's three claims, we briefly set forth the standard of review. "The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. *State* v. *Barnes*, 232 Conn. 740, 746–47, 657 A.2d 611 (1995). Furthermore, [t]o establish an abuse of discretion, [the defendant] must show that the restrictions imposed upon [the] cross-examination were clearly prejudicial. . . . *State* v. *Castro*, 196 Conn. 421, 426, 493 A.2d 223 (1995)." (Internal quotation marks omitted.) *State* v. *Ferguson*, 260 Conn. 339, 351, 796 A.2d 1118 (2002). In order to establish reversible error on an evidentiary impropriety, however, the defendant must prove both an abuse of discretion and a harm that resulted from such abuse. *State* v. *Young*, 258 Conn. 79, 94–95, 779 A.2d 112 (2001); *State* v. *Hamilton*, 228 Conn. 234, 244, 636 A.2d 760 (1994).

"The proffering party bears the burden of establishing the relevance of the offered testimony. Unless such a proper foundation is established, the evidence . . . is irrelevant. . . . *State* v. *Barnes*, supra, [232 Conn.] 747. When the trial court excludes defense evidence that provides the defendant with a basis for cross-examination of the state's witnesses, however, such exclusion may give rise to a claim of denial of the right to confrontation and to present a defense. *State* v. *Casanova*, 255 Conn. 581, 592, 767 A.2d 1189 (2001)." (Internal quotation marks omitted.) *State* v. *Ferguson*, supra, 260 Conn. 351. When constitutional error is established, the state must prove that the error was harmless beyond a reasonable doubt. *State* v. *Cavell*, 235 Conn. 711, 720, 670 A.2d 261 (1996). With these principles in mind, we turn to the defendant's claims.

## B

The defendant first claims that the trial court improperly ruled both that defense counsel's cross-examination of Rovella was outside the scope of direct examination and that the evidence was irrelevant. We disagree.

It is a well established rule of evidence that cross-examination is restricted to matters covered on direct examination. *State* v. *Prioleau*, supra, 235 Conn. 302; *State* v. *Pierson*, 201 Conn. 211, 224, 514 A.2d 724 (1986), on appeal after remand, 208 Conn. 683, 546 A.2d 268 (1988), cert. denied, 489 U.S. 1016, 109 S. Ct. 1131, 103 L. Ed. 2d 193 (1989). "A question [on cross-examination] is within the scope of the direct examination if it is designed to 'rebut, impeach, modify, or explain any of the defendant's direct testimony.'" *State* v. *Sharpe*, 195 Conn. 651, 657, 491 A.2d 345 (1985), quoting *State* v. *Zdanis*, 173 Conn. 189, 196, 377 A.2d 275 (1977). The trial court is given broad discretion to determine whether a particular line of cross-examination is within

the scope of the direct examination. *State* v. *Prioleau,* supra, 302.

In the present case, the state did not offer Rovella as an expert witness on gangs in general. Rather, the state used Rovella to introduce evidence about the crime scene, to read into the record the statement given by the defendant to the police, and to testify that none of the victims was listed in the department's gang database. Rovella did not testify, therefore, on direct examination, about gang membership or gang activity generally, and, accordingly, the defendant's question regarding the fluidity of gang membership on cross-examination was beyond the scope of that direct examination. As such, the trial court did not abuse its discretion by precluding the defendant from eliciting a response to that question.

Moreover, we note that the trial court suggested that the defendant call Rovella as his own witness, but the defendant chose not to do so. The defendant's claim of harm, therefore, even if warranted, was of his own making. He cannot relinquish voluntarily an opportunity to call a witness and then later invoke as error his failure to do so.

The defendant also claims that the trial court improperly concluded that Rovella's testimony regarding the fluidity of gang membership was irrelevant. The defendant claims that general facts regarding membership in the Latin Kings gang was relevant to establish the reasonableness of his belief that the victims were gang members and, accordingly, the reasonableness of his belief that he was in imminent danger of harm. We disagree.

The following principles guide our review of this claim. It is well established that, "[r]elevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is irrel-

evant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *Wargo*, 255 Conn. 113, 123–24, 763 A.2d 1 (2000). Although defense evidence excluded on evidentiary grounds may give rise to a claim of denial of the rights to confrontation and to present a defense; *Chambers* v. *Mississippi*, 410 U.S. 284, 289–90, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); a defendant is bound by the rules of evidence in presenting a defense. *State* v. *Kelly*, 208 Conn. 365, 375–76, 545 A.2d 1048 (1988); *State* v. *Watson*, 26 Conn. App. 151, 156, 599 A.2d 385 (1991), cert. denied, 221 Conn. 907, 600 A.2d 1362 (1992). Accordingly, if the proffered testimony is not relevant, it is properly excluded. *State* v. *Kelly*, supra, 376.

"It is well settled . . . that an accused may introduce evidence of the violent, dangerous or turbulent character of the victim to show that the accused had reason to fear serious harm, after laying a proper foundation by adducing evidence that he acted in self-defense and that he was aware of the victim's violent character." *State* v. *Miranda*, 176 Conn. 107, 109, 405 A.2d 622 (1978). Generalized testimony about the violent tendencies of gang members unconnected to the victim, however, is not relevant to a determination of the justification of self-defense. *State* v. *Matos*, 240 Conn. 743, 764–65, 694 A.2d 775 (1997). Similarly, testimony about gang symbols and organization are irrelevant, without evidence linking those characteristics to the victims. *State* v. *Hayles*, 52 Conn. App. 564, 569, 727 A.2d 762 (1999). A defendant asserting the justification

of self-defense, based on his belief that the victims were gang members, need not prove that the victims were, in fact, gang members. A general fact about gang characteristics or membership must, however, in order to be relevant, provide the jury with a rational, and not a speculative basis upon which to infer that the defendant's belief that certain individuals were gang members was reasonable. Cf. *Bovat* v. *Waterbury*, 258 Conn. 574, 596, 783 A.2d 1001 (2001) (trial court properly excluded evidence where "connection between the inference and the fact sought to be established was so tenuous as to require the jury to engage in sheer speculation"); *State* v. *Boles*, 223 Conn. 535, 549, 613 A.2d 770 (1992) (same).

In the present case, Rovella had testified that the victims were not, according to the police database, members of a street gang. Testimony from Rovella addressing the fluidity of membership in the Latin Kings gang would not have provided a nonspeculative basis from which the jury could infer that the defendant reasonably could have believed that the victims were members of the Latin Kings. Mere presence in an area frequented by members of the Latin Kings does not establish a sufficient basis for the relevancy of that testimony. Accordingly, the testimony properly was excluded as irrelevant.

## C

The defendant also claims that the trial court improperly granted the state's motion in limine to exclude as irrelevant the defendant's proffered testimony about his belief that the individuals in the group on School Street were gang members. In its motion, the state had contended that any testimony by the defendant regarding gangs should be inadmissible as irrelevant "unless and until the defendant testifie[s] that he actually shot one or more of the victims and that his state of mind

was influenced by actual knowledge that the victim was a gang member."

As we have explained in part II B of this opinion, evidence about gang membership or the presence of gangs in the School Street area is relevant to the reasonableness of the defendant's belief that the victims were gang members only if he provided some connection between that evidence and the victims. In his offer of proof, the defendant provided no evidence to establish such a connection. Therefore, the trial court properly excluded the defendant's testimony offered to establish the reasonableness of his belief.

The defendant also contended, however, that his testimony was relevant to establish his *subjective* belief that the victims were gang members. A defendant's testimony regarding his state of mind is relevant to a claim of self-defense. *State* v. *De Santis*, 178 Conn. 534, 539-40, 423 A.2d 149 (1979). To the extent that the trial court's ruling precluded the defendant from testifying regarding his state of mind, the trial court abused its discretion.

The exclusion of the defendant's testimony for that purpose was not unduly prejudicial, however, because it was cumulative of other testimony that had been presented to establish his state of mind. See *State* v. *DeJesus*, 260 Conn. 466, 486, 797 A.2d 1101 (2002) (exclusion of cumulative evidence not prejudicial). In the present case, the defendant had testified that he believed some members of the group were Latin King members, Rovella had read into evidence the defendant's statement to police to that effect, and, finally, the defendant's friend had testified that, after the shooting, the defendant had told her that he had been in a fight with some members of the Latin Kings. Accordingly, we conclude that the trial court's ruling did not prejudice

the defendant and the exclusion of that evidence was therefore harmless.

D

Finally, the defendant challenges the exclusion of the testimony of Paturzo, whom the defendant offered as an expert on gangs in Hartford. Applying the same legal principles that we have articulated in part II B and C of this opinion, we conclude that the trial court did not abuse its discretion by excluding Paturzo's testimony. Paturzo did not indicate that any of the victims was a gang member nor did he offer testimony that would tend to make the defendant's objective belief that the victims were gang members more or less likely. Furthermore, the proffered testimony was cumulative in nature, as evidence previously had been admitted demonstrating that the School Street area was known as a Latin King stronghold and that the defendant believed the victims were members of the Latin Kings. See *State* v. *Matos*, supra, 240 Conn. 764–65 (concluding that trial court did not abuse discretion by excluding as irrelevant testimony concerning gang members' propensity for violence, when defendant previously had testified he feared victim). We conclude, therefore, that the trial court did not abuse its discretion in excluding Paturzo's testimony.

The judgment is affirmed.

In this opinion the other justices concurred.