CONNECTICUT PODIATRIC MEDICAL ASSOCIATION ET AL. *v.* HEALTH NET OF CONNECTICUT, INC.
(SC 18267)

Norcott, Palmer, Zarella, McLachlan, Harper, Vertefeuille and Bear, Js.*

---

* This case originally was argued before a panel of this court consisting of Justices Norcott, Palmer, McLachlan and Vertefeuille, and Judge Bear. Thereafter, on July 22, 2011, the court, pursuant to Practice Book § 70-7 (b), sua sponte, ordered that the case be considered en banc. Accordingly, Justices Zarella and Harper were added to the panel, and they have read the record, briefs and transcript of the oral argument.

Argued October 20, 2010—officially released October 18, 2011

*Francis J. Brady,* with whom were *Michael C. Markowicz* and, on the brief, *Everett E. Newton* and *Marilyn B. Fagelson,* for the appellants (plaintiffs).

*Linda L. Morkan*, with whom were *Theodore J. Tucci* and *Michael J. Kolosky*, for the appellee (defendant).

*J. Gregory Robinson*, *Christopher H. Grigorian* and *Kelli Back* filed a brief for the American Podiatric Medical Association as amicus curiae.

*Opinion*

McLACHLAN, J. The plaintiff podiatrists, Jeffrey F. Yale, Anthony R. Iorio, and R. Daniel Davis (individual podiatrists), and the named plaintiff, the Connecticut Podiatric Medical Association (association), appeal[1] from the grant of summary judgment in favor of the defendant, Health Net of Connecticut, Inc. The plaintiffs argue that the trial court improperly concluded that, as a matter of law, the defendant's practice of reimbursing the individual podiatrists at a lower rate than medical doctors for the same procedures does not constitute "unfair discrimination" in violation of the Connecticut Unfair Insurance Practices Act (CUIPA), General Statutes § 38a-815 et seq., and the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.[2] The defendant contends that the judgment of the trial court may be affirmed on the alternate ground that the individual podiatrists do not have standing to pursue damages.[3] Because we conclude that the protection against "unfair discrimination" in General Statutes

---

[1] The plaintiffs appealed from the decision of the trial court to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] The plaintiffs also contend that the trial court abused its discretion in denying their motion to strike or to respond to the defendant's argument, raised for the first time in its reply brief in support of its motion for summary judgment, that nondiscriminatory "market forces" justify the defendant's conduct. Because the trial court did not render summary judgment on the basis of "market forces," and because we do not affirm the trial court's judgment on that basis, we do not address that claim.

[3] Although the defendant's preliminary statement of the issues raised as an alternate ground for affirmance the claim that the action was federally preempted, the defendant expressly abandoned that argument in its brief.

§ 38a-816 (10)[4] is limited to denials of reimbursement, we affirm the judgment of the trial court.

The trial court set forth the following relevant facts in its memorandum of decision rendering summary judgment in favor of the defendant. The defendant issues health care insurance policies to provide coverage for medical services and enters into contracts with practitioners of the healing arts to provide those services. The individual podiatrists are licensed to practice in the state of Connecticut and are network providers of services pursuant to provider agreements with the defendant. Pursuant to those agreements, the individual podiatrists administer podiatric care to patients who are members of a health care insurance plan that is issued or administered by the defendant. The defendant has entered into agreements with its insureds to provide health insurance coverage for a variety of medical services, and for each service, the defendant has designated a specific current procedural terminology code (code). In order to receive payment for services that they provide to the defendant's insureds, the individual podiatrists inform the defendant of the type of service provided by using the code that has been assigned to that particular service. Pursuant to its provider agreements with the individual podiatrists, the defendant reimburses them for the services that they have provided by paying a set amount for each code.

---

[4] General Statutes § 38a-816 provides in relevant part: "The following are defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance . . .

"(10) Notwithstanding any provision of any policy of insurance, certificate or service contract, whenever such insurance policy or certificate or service contract provides for reimbursement for any services which may be legally performed by any practitioner of the healing arts licensed to practice in this state, reimbursement under such insurance policy, certificate or service contract shall not be denied because of race, color or creed nor shall any insurer make or permit any unfair discrimination against particular individuals or persons so licensed. . . ."

The defendant also enters into provider agreements with medical doctors who are licensed to practice in Connecticut. Pursuant to those agreements, the medical doctors are network providers of medical services to patients who participate in a health plan issued or administered by the defendant. Some of the medical doctors administer health care for the foot. Like the individual podiatrists, medical doctors who contract with the defendant inform the defendant of the services provided by submitting the designated codes. In some instances, the individual podiatrists and medical doctors administer the same services using the same codes, but the defendant pays the medical doctors more than it pays the individual podiatrists for the identical service, designated by the identical code.

The plaintiffs brought the present action, alleging that the defendant's practice of reimbursing the individual podiatrists at a lower rate than medical doctors for the same service, designated by the identical code, constitutes an unfair trade practice in violation of CUTPA and CUIPA. The plaintiffs sought both monetary and injunctive relief. The trial court granted the defendant's motion to dismiss the association's claims for monetary relief, concluding that it lacked representational standing because the claim for monetary damages would require the participation of the individual podiatrists.[5] Subsequently, the court granted the defendant's motion for summary judgment, concluding that § 38a-816 (10) does not require insurance providers to reimburse podiatrists at the same rate that it reimburses medical doctors for the same services. Because the court resolved the issue in favor of the defendant on the merits, it concluded that it was unnecessary to consider the defendant's claim that the individual podiatrists lacked standing. This appeal followed.

---

[5] Because the association's claims for injunctive relief were not the subject of the motion to dismiss, the association remains a plaintiff in this action.

Because it implicates subject matter jurisdiction, we first address the defendant's claim that the trial court's judgment may be affirmed on the alternate ground that the individual podiatrists lack standing to pursue damages. The defendant claims that because it reimburses the individual podiatrists' practice groups, any injury suffered by the individual podiatrists is too remote. We disagree.

"[N]otwithstanding the broad language and remedial purpose of CUTPA, we have applied traditional common-law principles of remoteness and proximate causation to determine whether a party has standing to bring an action under CUTPA." *Vacco* v. *Microsoft Corp.*, 260 Conn. 59, 88, 793 A.2d 1048 (2002). "It is axiomatic that a party must have standing to assert a claim in order for the court to have subject matter jurisdiction over the claim. . . . Our standing jurisprudence consistently has embodied the notion that there must be a colorable claim of a direct injury to the plaintiff, in an individual or representative capacity. . . . The requirement of directness between the injuries claimed by the plaintiff and the conduct of the defendant also is expressed, in our standing jurisprudence, by the focus on whether the plaintiff is the proper party to assert the claim at issue. . . . Thus, to state these basic propositions another way, if the injuries claimed by the plaintiff are remote, indirect or derivative with respect to the defendant's conduct, the plaintiff is not the proper party to assert them and lacks standing to do so. [When], for example, the harms asserted to have been suffered directly by a plaintiff are in reality derivative of injuries to a third party, the injuries are not direct but are indirect, and the plaintiff has no standing to assert them." (Citations omitted.) *Ganim* v. *Smith & Wesson Corp.*, 258 Conn. 313, 346–48, 780 A.2d 98 (2001).

We employ "a three part policy analysis . . . [in applying] the general principle that plaintiffs with indi-

rect injuries lack standing to sue . . . . First, the more indirect an injury is, the more difficult it becomes to determine the amount of [the] plaintiff's damages attributable to the wrongdoing as opposed to other, independent factors. Second, recognizing claims by the indirectly injured would require courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, in order to avoid the risk of multiple recoveries. Third, struggling with the first two problems is unnecessary [when] there are directly injured parties who can remedy the harm without these attendant problems." (Internal quotation marks omitted.) *Vacco* v. *Microsoft Corp.*, supra, 260 Conn. 89.

The right to reimbursement is derived from the provider agreements. The individual podiatrists, not their practice groups, are the parties to the provider agreements. Because only the individual podiatrists can enforce their contractual rights under the provider agreements, there is no party that is more directly injured or in a better position to remedy the alleged harm. The mere fact that, for the sake of convenience, the practice groups rather than the individual podiatrists directly received the reimbursement that was due pursuant to the provider agreements does not render the injury too remote. Accordingly, the individual podiatrists have standing.

We next address the plaintiffs' claim that the trial court improperly concluded that, as a matter of law, the defendant's practice of reimbursing the individual podiatrists at a lesser rate than medical doctors, for the same procedures, does not constitute "unfair discrimination" in violation of § 38a-816 (10). The plaintiffs contend that the term "unfair discrimination" in § 38a-816 (10), includes setting different reimbursement rates solely on the basis of license. In other words, the plaintiffs argue that the statute prohibits discrimination

against podiatrists in favor of medical doctors with respect to the rate of reimbursement. We conclude that the legislature did not intend to include the practice of reimbursing podiatrists and medical doctors at different rates for the same services within the term "unfair discrimination" in § 38a-816 (10). Accordingly, we affirm the trial court's summary judgment in favor of the defendant.

The question of whether the term "unfair discrimination" in § 38a-816 (10) precludes setting different reimbursement rates solely on the basis of license presents a question of statutory interpretation, over which we exercise plenary review, guided by well established principles regarding legislative intent. See *Hartford/ Windsor Healthcare Properties, LLC* v. *Hartford*, 298 Conn. 191, 197–98, 3 A.3d 56 (2010) (explaining plain meaning rule under General Statutes § 1-2z and setting forth process for ascertaining legislative intent).

As directed by § 1-2z, we begin with the text of § 38a-816, which provides in relevant part: "The following are defined as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance . . . (10) Notwithstanding any provision of any policy of insurance, certificate or service contract, whenever such insurance policy or certificate or service contract provides for reimbursement for any services which may be legally performed by any practitioner of the healing arts licensed to practice in this state, reimbursement under such insurance policy, certificate or service contract shall not be denied because of race, color or creed nor shall any insurer make or permit any unfair discrimination against particular individuals or persons so licensed. . . ."

Subdivision (10) of § 38a-816 may be divided into four clauses. The first clause, "[n]otwithstanding any provision of any policy of insurance, certificate or ser-

vice contract," prevents private parties from con-
tracting out of the requirements set forth in § 38a-816
(10). The second clause establishes when § 38a-816 (10)
applies, namely, "whenever such insurance policy or
certificate or service contract provides for reimburse-
ment for any services which may be legally performed
by any practitioner of the healing arts licensed to prac-
tice in this state . . . ." Because General Statutes § 20-
1 defines the "practice of the healing arts" as "the prac-
tice of medicine, chiropractic, *podiatry*, natureopathy
and, except as used in chapters 384a and 388, the prac-
tice of optometry"; (emphasis added); podiatry is
included within the term "practice of the healing arts"
as used in § 38a-816 (10).

The final two clauses of § 38a-816 (10) define the
protection provided by the statute, setting forth the
prohibited practices. Whereas the scope of the third
clause is easy to discern—it is expressly limited to
decisions *denying* reimbursement and its protection
extends to denials made on the basis of race, color or
creed—the fourth clause simply prohibits insurers from
making or permitting "unfair discrimination," without
expressly limiting that prohibition to a particular con-
text.[6] Because § 38a-816 (10) applies only when the

---

[6] The dissent asserts that our reading of the statutory language, which
construes the express limitation of the third clause to denials of reimburse-
ment to mean what it says, that is, to limit the scope of the third clause to
*denials* of reimbursement, is "simply . . . inconceivable . . . ." The dis-
sent contends that the literal language of § 38a-816 (10), so construed, per-
mits discrimination on the basis of race, color or creed in setting
reimbursement rates. Section 38a-816 (10) does not, however, sanction *any*
discriminatory actions; it provides a civil remedy for discriminatory denials
of reimbursement.

As explained in this opinion, the text and legislative history of this statute
reflect that the legislature had a particular issue in mind in drafting this
legislation—namely, preventing discriminatory denials of reimbursement,
in the interest of both practitioners of the healing arts and patients, who
have a right to have broad access to health care. All of the evidence supports
our conclusion that the legislature crafted the statute to address that spe-
cific issue.

In addition, the issue of discrimination on the basis of race, color or creed
is not before us in this appeal. The present case does not involve such a

relevant policy, certificate or contract provides for reimbursement for medical services, at the outset it is clear that the scope of "unfair discrimination" is limited to an insurer's actions with respect to reimbursement. The two questions we must resolve are: (1) to whom does the protection of the fourth clause extend; and (2) does the prohibition against "unfair discrimination" encompass all aspects of reimbursement, or merely denials of reimbursement. We address each question in turn.

claim, and none of the parties nor the amici have briefed this issue. We acknowledge, however, that our decision could be relied upon as authority for the proposition that § 38a-816 (10) provides no remedy for discrimination on the basis of race, color or creed. It is difficult to imagine that the legislature would not intend to provide a remedy for such discrimination. It is worth noting, however, that the genealogy of the statute reflects that the legislature's provision of remedies for race discrimination have been incremental from the outset. When the discrimination provision originally was enacted; see Public Acts 1967, No. 852, § 1; race discrimination was deemed an unfair practice only when an insurance policy covered procedures that a licensed chiropractor could perform. It also is worth noting that the only comment in the legislative history regarding the clause barring race discrimination in denials of reimbursement is from William Cotter, the insurance commissioner at that time, who testified at a committee hearing on the original bill as follows: "As far as discrimination because of race, color or creed, we have exerci[s]ed authority over this for [some time and] this is not a problem as we see it." Conn. Joint Standing Committee Hearings, Insurance, 1967 Sess., p. 173.

We believe that the proper approach, rather than inferring that the only options are to rewrite the statute or to leave certain discrimination without a remedy, is to recognize that the legislature simply did not anticipate the problem, and to give the legislature the opportunity to address it.

Accordingly, we will not overreach to decide an issue that is not before us. Judicial restraint counsels us to commend the issue to the attention of the legislature for further review, as is appropriate. We consistently have held that "the task of changing the law lies with the legislature, and not with the judiciary. In construing a statute, the cardinal principle of construction is to ascertain the intent of the legislature. If an act passed by the legislature is within its constitutional power, it is not the business of the court to attempt to twist the interpretation of the law to conform to the ideas of the judges as to what the law ought to be or to attempt to make the law coincide with their ideas of social justice. The judicial function should not invade the province of the legislature." (Internal quotation marks omitted.) *Director of Health Affairs Policy Planning* v. *Freedom of Information Commission,* 293 Conn. 164, 182, 977 A.2d 148 (2009).

In ascertaining the scope of the fourth clause, we are mindful that "[i]t is a basic tenet of statutory construction that the legislature [does] not intend to enact meaningless provisions. . . . [I]n construing statutes, we presume that there is a purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous. . . . Because [e]very word and phrase [of a statute] is presumed to have meaning . . . [a statute] must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant." (Internal quotation marks omitted.) *Lopa* v. *Brinker International, Inc.*, 296 Conn. 426, 433, 994 A.2d 1265 (2010). That rule of statutory construction suggests that in interpreting the scope and meaning of the term "unfair discrimination," in the fourth clause of § 38a-816 (10), we must not render the third clause superfluous. That is, we cannot interpret the fourth clause so broadly that it completely encompasses the meaning of the third clause. The same principle of statutory construction also counsels against interpreting the fourth clause of § 38a-816 (10) in such a way that it is completely included within the meaning of the third clause.

We observe preliminarily that the scope of the third and fourth clauses differs in that the third clause expresses a categorical prohibition—"reimbursement . . . shall not be denied because of race, color or creed"—whereas the prohibition in the fourth clause is conditional. That is, the fourth clause prohibits only discrimination that is "unfair." It follows that "fair" discrimination within the meaning of the fourth clause would be permitted under the statute. Keeping that distinction in mind, we turn to the first question of statutory interpretation before us: to whom does the protection of the fourth clause extend. The fourth clause prohibits insurers from making or permitting "any unfair discrimination against particular individuals

or persons so licensed." The key language in identifying the group of persons to whom the protection of the statute extends is "particular individuals or persons so licensed." Two possible interpretations are suggested by the statutory language. First, it is possible to interpret "particular individuals or persons" to signify that the legislature intended to extend protection to single, licensed individuals as individuals, not as members of a particular licensure group. For example, such an interpretation would prohibit reimbursing one particular podiatrist at a different rate than all other licensed podiatrists, indeed, all other licensed practitioners of the healing arts, for providing the same service, not because he or she is a podiatrist, but for some other reason. Another possible interpretation is that the fourth clause extends protection against discrimination *on the basis of licensure* to particular individuals or persons. Such an interpretation would implicate the factual scenario in the present case, that is, reimbursing podiatrists at a different rate than other licensed practitioners of the healing arts for providing the same service, because they are podiatrists. Because nothing in the statutory language of § 38a-816 (10) resolves the ambiguity, we look to related statutes for guidance as to whether the legislature intended the term "unfair discrimination" to prohibit discrimination against individuals who are licensed or to prohibit discrimination on the basis of licensure itself.

Although "discrimination" is not defined in § 38a-816 (10), the term is used throughout title 38a of the General Statutes, which deals with insurance practices. With respect to health insurance, the insurance commissioner (commissioner) is empowered to prescribe regulations to ensure that rates set for individual health insurance policies "shall not be excessive, inadequate or unfairly discriminatory. . . ." General Statutes § 38a-481 (b). Various health care centers, insurance

companies, medical and legal service corporations are required to file a schedule of rates to be paid by subscribers with the commissioner, who may refuse approval of such a schedule if the rates are found "to be excessive, inadequate or discriminatory. . . ." General Statutes §§ 38a-183 (a), 38a-208, 38a-218 and 38a-236. General Statutes § 38a-488 contains a general prohibition against discrimination with respect to health insurance rates and premiums, providing: "Discrimination between individuals of the same class in the amount of premiums or rates charged for any individual health insurance policy, or in the benefits payable thereon, or in any of the terms or conditions of such policy, or in any other manner, is prohibited." Under General Statutes § 38a-505 (b), "[t]he commissioner shall adopt regulations . . . that specify prohibited policy provisions not otherwise specifically authorized by statute which in the opinion of the commissioner are unjust, unfair or unfairly discriminatory . . . ." As for the health reinsurance association created by General Statutes § 38a-556 (c) (3), "[r]ates for coverage issued by or through the association shall not be excessive, inadequate or unfairly discriminatory. . . ." The commissioner may refuse approval for a schedule of charges for enrollee coverage for dental services if the commissioner finds the rates to be "unfairly discriminatory." General Statutes § 38a-582 (a).

From these related statutes, it appears that "discrimination" is used in § 38a-816 (10) in a broad manner to mean disparate treatment. Moreover, consistent with General Statutes § 1-1 (a), which directs that in the construction of statutes, "words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases . . . shall be construed and understood accordingly," we construe "unfair discrimination," as used in § 38a-816 (10), to refer generally to "[a] failure to treat all persons

equally where no reasonable distinction can be found between those favored and those not favored." Black's Law Dictionary (6th Ed. 1990). That broad definition is consistent with either of the possible interpretations that we have before us. Accordingly, we conclude that the statutory language is ambiguous and turn to extra-textual sources for further guidance. Because we also conclude that the statutory language is ambiguous as to the second question presented—namely, whether § 38a-816 (10) was intended to prohibit only discriminatory denials of reimbursement, or whether it also prohibits discriminatory rate setting—we first explain why the statutory text does not resolve that question, then look to the extratextual sources to provide guidance as to both issues.

In addressing the second question of whether the prohibition against "unfair discrimination" applies to all reimbursement decisions, including the setting of reimbursement rates, or is restricted to denials of reimbursement, we first turn to the statutory language of § 38a-816 (10). The fact that the third clause is expressly limited to "denials" of reimbursement at least suggests that the legislature intended the same limitation to apply to the fourth clause. It certainly would be incongruous to extend the protection against other forms of discrimination to reimbursement rates, but to limit the protection against discrimination on the basis of race, color or creed to reimbursement denials. Although that suggestion provides strong evidence, it does not resolve the ambiguity. Accordingly, we look to related statutes. None of the other subdivisions within § 38a-816 prove helpful. Several subdivisions of § 38a-816 prohibit charging an individual a different rate for the same coverage because of various conditions, including "physical disability or mental retardation"; General Statutes § 38a-816 (12); "blindness or partial blindness"; General Statutes § 38a-816 (13); and having been

exposed "to diethylstilbestrol through the female parent." General Statutes § 38a-816 (14). None of these subdivisions, refer in any way to whether *reimbursement* at a different rate is prohibited under § 38a-816 (10). Subdivision (15), the only other provision of § 38a-816 that discusses reimbursement, concerns time periods for payment, including reimbursement, but does not address rates of reimbursement.

Other statutes in the insurance chapter of the General Statutes do, however, address discriminatory rate setting. For example, § 38a-236 provides in relevant part: "No nonprofit legal service corporation, as defined in section 38a-230, shall enter into any contract with subscribers unless and until it has filed with the . . . [c]ommissioner a full schedule of the rates to be paid by the subscriber and has obtained said commissioner's approval thereof. *The commissioner may refuse such approval if he finds such rates are excessive, inadequate or unfairly discriminatory. . . .*" (Emphasis added.) General Statutes § 38a-418 (a), which sets standards for premium rates, expressly provides that such rates "shall not be inadequate, excessive, or unfairly discriminatory." Section 38a-481 (b) establishes procedures for approval of individual health insurance policies and requires the commissioner to adopt regulations to set standards to ensure that the rates set in such policies "shall not be excessive, inadequate or unfairly discriminatory. . . ." See also General Statutes § 38a-582 (commissioner may disapprove schedule of charges for enrollee coverage for dental services if commissioner finds that charges are "excessive, inadequate or unfairly discriminatory"); General Statutes § 38a-623 (prohibiting "unfair discrimination" in setting rates for life insurance premiums); General Statutes § 38a-665 (a) (rates for commercial risk insurance may not be "excessive or inadequate . . . nor shall they be unfairly discriminatory"); General Statutes § 38a-688 (a)

(1) (prohibiting "unfairly discriminatory rating practices" for personal risk insurance). The fact that the legislature specifically addressed discriminatory rate setting in these other, similar contexts, yet did not do so in § 38a-816 (10) provides further support, albeit not determinative, for interpreting "unfair discrimination" in the fourth clause of § 38a-816 (10) to be restricted to denials of reimbursement. See *Saunders* v. *Firtel*, 293 Conn. 515, 527, 978 A.2d 487 (2009) ("when a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed" [internal quotation marks omitted]).

Because our analysis of the text of § 38a-816 (10) and related statutes does not resolve either of the two questions presented, we turn to extratextual sources. In 1967, the legislature amended § 38a-816, then codified at General Statutes § 38-61, by adding the following antidiscrimination provision: "Notwithstanding any provision of any policy of insurance, certificate or service contract, whenever such insurance policy or certificate or service contract provides for reimbursement for any services *which may be legally performed by* any person licensed under the provisions of chapter 372, reimbursement under such insurance policy, certificate or service contract shall not be denied because of race, color or creed nor shall any insurer make or permit any unfair discrimination against particular individuals or persons licensed under said chapter." (Emphasis added.) Public Acts 1967, No. 852, § 1. The discussion of the amendment, both in the House of Representatives and Senate, clarifies that the legislature's dual purpose was to benefit both chiropractors, who are licensed pursuant to chapter 372, and their patients by ensuring that individuals who chose to seek treatment from chiropractors would receive insurance

coverage. When asked why the amendment was necessary, Representative Paul Á. LaRosa explained that, at the time, some health insurance carriers did not reimburse chiropractors for treatment of persons covered under the health insurance policies provided by those carriers. He further explained that because the amendment would require insurance companies to provide coverage for treatment provided by chiropractors, such persons would have the freedom to seek treatment from chiropractors. 12 H.R. Proc., Pt. 8, 1967 Sess., p. 3328; see also 12 S. Proc., Pt. 5, 1967 Sess., p. 2346, remarks of Senator John P. Janovic ("This act will prohibit an insurance company from denying benefits to a person treated by a chiropractor. It will prohibit insurance companies from discriminating against a chiropractor for services rendered under future insurance contracts.").

In 1969, the legislature replaced the phrase "person licensed under the provisions of chapter 372" with the phrase "practitioner of the healing arts licensed to practice in this state." Public Acts 1969, No. 651, § 1. At that time, § 20-1 defined the "practice of the healing arts" as the practice of medicine, chiropractic, naturopathy and osteopathy. The purpose of the 1969 amendment was to extend the antidiscrimination protection to naturopathic and osteopathic physicians. See 13 S. Proc., Pt. 6, 1969 Sess., pp. 3039–40, remarks of Senator George L. Gunther. Senator Gunther described the scope of the protection afforded to practitioners of the healing arts by the amendment, which is now codified at § 38a-816 (10), as eliminating "any insurance reimbursement being *denied* anyone based on race, color, creed, *or healing art*." (Emphasis added.) Conn. Joint Standing Committee Hearings, Insurance, 1969 Sess., p. 1. In 1981, the legislature amended § 20-1 to include podiatry among the healing arts—thus extending the protection against "unfair discrimination" in § 38a-816 (10) to podiatrists. Public Acts 1981, No. 81-471, § 4.

The legislative history supports two conclusions regarding the scope of the protection against "unfair discrimination" provided by § 38a-816 (10). First, the legislative history supports our conclusion that the fourth clause of § 38a-816 (10) was intended to prevent "unfair discrimination" based on licensure. That conclusion is supported both by the gradual and deliberate extension of the protection to different licensures and by Senator Gunther's remark that § 38a-816 (10) protected against discrimination based on the particular "healing art." The legislative history also suggests, however, that the type of decisions contemplated by § 38a-816 (10) were limited to *denials* of reimbursement. That conclusion is supported by the dual purpose of § 38a-816 (10), which not only protects practitioners of the healing arts from discrimination, but also ensures that subscribers will have coverage for treatment by any practitioner of the healing arts licensed to practice in this state, regardless of the particular license that practitioner holds. The second purpose would be directly implicated only by denials of reimbursement, not by reimbursement at different rates.[7] Second, all of the remarks during the legislature's consideration of the original bill in 1967 and its amendment in 1969, refer to *denials* of reimbursement. See Public Acts 1967, No. 852, § 1; Public Acts 1969, No. 651, § 1. The entire thrust

[7] The plaintiffs contend that reimbursement at different levels *could* implicate coverage. By way of illustration, the plaintiffs offer a hypothetical example of a podiatrist being reimbursed $1 for the same service for which a medical doctor is reimbursed $100. Nothing in the record substantiates the likelihood of such an extreme discrepancy in reimbursement rates. Indeed, such a discrepancy would require insurers to act against their own best interest by in effect discouraging lower cost providers from participating in the insurance network, which would force subscribers to seek treatment with the higher cost providers. At a time when society is concerned with the high costs of health care in general, it would make no sense to adopt rules that would discourage the lowest cost provider from performing the required treatment. Moreover, if an insurer were to act in such a manner, we express no opinion as to whether such an action could be deemed tantamount to a denial and a bad faith act to make an end run around the law.

of the legislative changes to the statute was merely to include additional categories of practitioners of the healing arts for whom reimbursement is required. Not one remark indicates that the legislature intended to prohibit insurers from reimbursing practitioners at different rates based on license. Indeed, none of the remarks even mentions rates of reimbursement. Had the legislature intended such a result, it seems likely that someone associated with the insurance industry would have expressed an opinion on the matter in committee hearings. Indeed, there was opposition to the original proposed version of the statute, but not on the subject of pay parity. See Conn. Joint Standing Committee Hearings, Insurance, 1967 Sess., pp. 170–72, remarks of Joseph Cooney for Connecticut State Medical Society. Accordingly, we conclude that § 38a-816 (10), by prohibiting "unfair discrimination," bars the denial of reimbursement on the basis of the particular license held by a practitioner of the healing arts,[8] but does not preclude setting different reimbursement rates on the basis of the particular license held by a practitioner of the healing arts.

The judgment is affirmed.

In this opinion NORCOTT, ZARELLA, HARPER, VERTEFEUILLE and BEAR, Js., concurred.

PALMER, J., dissenting. Under General Statutes § 38a-816 (10), whenever an insurer enters into a service contract that provides for reimbursement for services performed by any practitioner of the healing arts licensed to practice in this state, including podiatrists, "reimbursement under such . . . service contract shall

---

[8] The plaintiffs claim that other states and federal statutes require that doctors of podiatric medicine and medical doctors be paid equally for administering the same services. They contend that these statutes support their claim that § 38a-816 (10) requires pay parity. We confine our analysis to our state statutes and applicable precedent.

not be denied because of race, color or creed nor shall any insurer make or permit any unfair discrimination against . . . persons so licensed." The majority concludes, first, that § 38a-816 (10) prohibits only the outright denial of reimbursement due to race, color or creed and, second, that the statutory prohibition against "any unfair discrimination" on the basis of licensure mirrors that prohibition and, likewise, bars only the complete denial of reimbursement on account of licensure. On the basis of this construction of § 38a-816 (10), the majority further concludes that, because it is undisputed that the defendant, Health Net of Connecticut, Inc., merely *discriminates* against podiatrists on account of licensure—that is, it pays podiatrists less than it pays medical doctors for the same care and treatment solely because podiatrists hold a different license than medical doctors—but does *not deny payment altogether* to podiatrists, the defendant's practice, as a matter of law, does not constitute unfair discrimination in violation of the Connecticut Unfair Insurance Practices Act (CUIPA), General Statutes § 38a-815 et seq., and the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.

In my view, the majority is wrong in its interpretation of the scope of the statutory prohibition against "any unfair discrimination" on the basis of licensure because, among other reasons, it is wrong in its predicate interpretation of the scope of the statutory protection barring discrimination on the basis of race, color or creed. Under that interpretation, the defendant is free to discriminate on the basis of race, color or creed, and also on the basis of licensure, unless the defendant *refuses altogether* to reimburse a licensed medical professional for covered services rendered. In other words, in reaching its conclusion that it is permissible under § 38a-816 (10) for an insurer to discriminate on the basis of licensure with respect to the amount it reimburses a

medical professional, the majority reaches the threshold conclusion that § 38a-816 (10) also does not bar an insurer from reimbursing a medical professional in an amount less than he or she otherwise would be entitled to receive for the same service merely because of his or her race, color or creed. This interpretation of § 38a-816 (10) is unacceptable because it imputes to the legislature an intent to countenance invidious discrimination, an unconscionable result that the legislature could not possibly have intended.

I would conclude, rather, that § 38a-816 (10) bars discrimination on the basis of race, color, creed or licensure both with respect to the outright denial of reimbursement and to the amount of reimbursement. Accordingly, I also would conclude that the named plaintiff, the Connecticut Podiatric Medical Association (association), and the individual plaintiffs, podiatrists Jeffrey F. Yale, Anthony R. Iorio, and R. Daniel Davis,[1] have set forth a viable claim that the setting of lower reimbursement rates that the defendant pays to podiatrists as compared to medical doctors—rates that the plaintiffs contend are unfairly discriminatory because the medical care that podiatrists provide is equal to or better in quality than the care that medical doctors provide for the same services—constitutes an unfair insurance practice in violation of § 38a-816 (10).[2] Accordingly, the plaintiffs are entitled to the opportunity to prove their claims at trial.

Before turning to the issue of statutory interpretation raised by the plaintiffs' appeal, it bears emphasis that

[1] I hereinafter refer to the association and the individual plaintiffs collectively as the plaintiffs.

[2] As the majority explains, the individual plaintiffs seek both damages and injunctive relief. The trial court dismissed the association's claim for damages, and the association has not appealed from the dismissal of that claim. Consequently, the association's claim is limited to injunctive relief. I agree with the majority that the plaintiffs have standing to pursue their respective claims.

the defendant does not challenge the plaintiffs' claim that the defendant reimburses podiatrists in an amount less than medical doctors for the same services and that the defendant does so solely because podiatrists hold a different license than medical doctors.[3] In fact, podiatrists collectively would have been paid approximately $1.2 million more annually by the defendant if they had been reimbursed at the same rates that the defendant reimburses medical doctors for the same services, an amount that represents more than one third of the annual total fees paid to podiatrists by the defendant. The defendant also does not dispute that this difference in reimbursement rates is not based on any difference in the quality of the medical care provided by podiatrists and medical doctors or on any differences in the education or training of podiatrists and medical doctors. In fact, according to expert testimony proffered by the plaintiffs, the education and training of podiatrists in foot and ankle care generally exceed that of medical doctors and orthopedic surgeons who do not specialize in such care. In addition, the plaintiffs maintain that the quality of care given by podiatrists is equal to or surpasses the quality of care given by medical doctors for procedures that fall within the scope of the practice of podiatrists. Finally, the plaintiffs contend that, in light of these facts, there is no legitimate justification for the different reimbursement rates for medical doctors and podiatrists. Because these allegations are supported by sworn affidavits and testimony, it was improper for the trial court to have granted the defendant's motion for summary judgment unless those facts, even if proven, were insufficient as a matter of law to support the plaintiffs' claims. See, e.g., *Liberty Mutual Ins. Co.* v. *Lone Star Industries, Inc.*, 290 Conn. 767,

---

[3] I note that the defendant is the only private insurer that reimburses podiatrists in this state at a lower rate than medical doctors for the performance of the same medical services.

787, 967 A.2d 1 (2009) ("[t]he party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to . . . judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact" [internal quotation marks omitted]). Contrary to the conclusion of the majority, the plaintiffs' allegations give rise to triable issues of fact.

The majority commences its statutory analysis by construing the language of § 38a-816 (10) that immediately precedes the language at issue in the present case. Specifically, the majority construes the phrase "reimbursement . . . shall not be denied because of race, color or creed," as follows: "[T]he scope of [that] . . . clause is easy to discern—it is expressly limited to decisions *denying* reimbursement and its protection extends to denials made on the basis of race, color or creed . . . ." (Emphasis in original.) Having concluded that the scope of that language is "limited to decisions denying reimbursement," the majority then states that the issue presented by this appeal is whether the scope of the language that follows, namely, "nor shall any insurer make or permit any unfair discrimination against particular individuals or persons so licensed"; General Statutes § 38a-816 (10); also is limited to decisions denying reimbursement, or whether the prohibition against unfair discrimination extends to all decisions concerning reimbursement, including rate setting.[4] The majority ultimately decides that the two provisions have exactly the same meaning, that is, they both apply *only* to *denials* of reimbursement and *not* to the *rate or amount* of reimbursement.

---

[4] For purposes of this appeal, I accept the majority's assertion that the scope of the "unfair discrimination" language of § 38a-816 (10) "is limited to an insurer's actions with respect to reimbursement." I also agree that that language prohibits any such discrimination on the basis of licensure.

The majority's conclusion is unsupportable for several reasons. First, it simply is inconceivable that the legislature intended for the language of § 38a-816 (10) that prohibits the denial of reimbursement on the basis of race, color or creed to be applied literally and strictly only to denials of reimbursement and not to other decisions concerning reimbursement. To conclude otherwise, as the majority does, leads to an utterly untenable result, namely, that it is *permissible* under § 38a-816 (10) for an insurer to discriminate on the basis of race, color or creed as long as that insurer does not deny reimbursement altogether. In other words, under the majority's analysis, it would be an acceptable practice for an insurer to discriminate on the basis of race, color or creed in establishing its reimbursement schedule. Indeed, because the provisions of CUIPA reflect the public policy of this state, as articulated by the legislature, both with respect to insurance practices that are prohibited and with respect to those that are not prohibited, under the majority's interpretation of § 38a-816 (10), discrimination on the basis of race, color or creed in the amount of reimbursement "[is] not so violative of the public policy of this state as to warrant statutory intervention."[5] *Mead* v. *Burns*, 199 Conn. 651, 666, 509 A.2d 11 (1986).

---

[5] In *Mead*, this court explained that, because "[t]he definition of unacceptable insurer conduct [under CUIPA requires proof that the conduct at issue constitutes a general business practice, that definition] reflects the legislative determination that isolated instances of unfair insurance settlement practices are not so violative of the public policy of this state as to warrant statutory intervention." *Mead* v. *Burns*, 199 Conn. 651, 666, 509 A.2d 11 (1986). Thus, in *Mead*, we held that, although CUTPA applies to unfair or unethical insurance practices, the plaintiff in *Mead* had not raised a viable claim under CUTPA merely by alleging a single instance of an alleged unfair settlement practice because to conclude otherwise would be contrary to the public policy reflected in the legislature's definition of unacceptable insurer conduct. See id., 665–66. In other words, the fact that the legislature has limited the reach of CUIPA to a certain category of insurance practices represents a legislative policy decision that conduct by an insurer that does not fall within that category is not prohibited.

For reasons so obvious that they require no elaboration, this cannot possibly reflect the intent of the legislature. In fact, it is difficult to think of conduct not barred by our Penal Code that is more clearly contrary to public policy than discrimination on the basis of race, color or creed. When strict adherence to the literal language of a statute leads to such an unconscionable result—a result that rationally cannot be attributed to the legislature—we will not apply that language in accordance with its literal meaning. See, e.g., *State* v. *Salamon*, 287 Conn. 509, 524, 949 A.2d 1092 (2008) ("[a]lthough we frequently adhere to the literal language of a statute, we are not bound to do so when it leads to unconscionable, anomalous or bizarre results"). Indeed, in light of the bizarre and intolerable result that is achieved by construction of the term "deni[al]" as representing only complete or total denials of reimbursement, common sense dictates that the term must be construed broadly to include partial denials of reimbursement. Thus, the only reasonable interpretation of the language of § 38a-816 (10) barring the denial of reimbursement on the basis of race, color or creed is that neither the denial of reimbursement *nor any other decision pertaining to reimbursement* is permitted to be made on the basis of race, color or creed. In fact, the majority's interpretation is so implausible that even the defendant does not contend that that provision permits discrimination on the basis of race, color or creed in the setting of reimbursement rates.[6]

Second, it cannot be disputed that the language of § 38a-816 (10) barring "any unfair discrimination" on the basis of licensure is worded in much broader terms than the statutory prohibition against the denial of reimbursement due to race, color or creed. Because the

---

[6] With respect to the provision of § 38a-816 (10) barring the denial of reimbursement on the basis of race, color or creed, the defendant states that the plaintiffs make no claim that the defendant has violated that provision.

provision specifically pertaining to reimbursement extends not only to the denial of reimbursement but also to decisions concerning the amount of reimbursement, the far broader prohibition against "any unfair discrimination" necessarily must also be read to include all such decisions. To conclude otherwise would be to ignore the fact that the language of that provision is significantly more encompassing than the language of the prohibition against denials of reimbursement on the basis of race, color or creed.

The majority acknowledges that, under its interpretation of § 38a-816 (10), that provision does not prohibit insurers from discriminating on the basis of race, color or creed with respect to the amount that those insurers reimburse medical professionals. The majority nevertheless seeks to justify its construction of § 38a-816 (10) by asserting, first, that, contrary to my statement that invidious discrimination is permitted under the majority's construction of § 38a-816 (10), that provision "does not . . . sanction any discriminatory actions; [rather] it provides a civil remedy for discriminatory denials of reimbursement"; footnote 6 of the majority opinion; and, second, that "the issue of discrimination on the basis of race, color or creed is not before us in this appeal" because "[t]he present case does not involve such a claim . . . ." Id. The majority's reliance on these semantical distinctions is unconvincing. With respect to the majority's first point, CUIPA represents a legislative determination that certain insurance practices are unfair and, therefore, must be prohibited. Under the majority's interpretation of CUIPA, discrimination in the amount of reimbursement on the basis of race, color or creed is *not* an unfair insurance practice. In light of the majority's express conclusion that such discrimination is *not prohibited* under CUIPA, it *necessarily is permitted* under CUIPA. See, e.g., *Mead* v. *Burns*, supra, 199 Conn. 665–66 (CUIPA establishes certain "regula-

tory principles" that reflect public policy determination of legislature in regard to both prohibited insurance practices and insurance practices that, because they are not prohibited, are permissible under CUIPA). For the majority to assert otherwise defies logic and ignores this court's prior pronouncement on the matter. See id.; see also *Quimby* v. *Kimberly Clark Corp.*, 28 Conn. App. 660, 671–72 and n.8, 613 A.2d 838 (1992) (observing, in accordance with *Mead*, that because definition of unfair insurance settlement practice for purposes of CUIPA requires proof that conduct at issue constituted general business practice, isolated instances of such conduct do not violate this state's public policy as articulated by legislature under CUIPA).

With respect to its second point, the majority's attempt to minimize the import of its interpretation of § 38a-816 (10) also is unavailing. Contrary to the majority's assertion, the issue of discrimination on the basis of race, color and creed most certainly *is* before this court in this appeal because the majority has elected to place it before the court by virtue of its statutory analysis. This is so because the majority's statutory interpretation is expressly predicated on its determination that § 38a-816 (10) bars only complete denials of reimbursement on the basis of race, color or creed, and not other discriminatory reimbursement practices based on race, color or creed. Thus, far from "overreach[ing] to decide an issue that is not before [this court]"; footnote 6 of the majority opinion; I am merely pointing out a necessary, and untenable, consequence of the majority's interpretive analysis.

Indeed, under the majority's narrow construction of § 38a-816 (10) as prohibiting only the complete denial of reimbursement on the basis of race, color or creed, an insurer readily could defeat that prohibition. Specifically, if an insurer wished to prevent a medical professional from participating in its network because of his

or her race, color or creed, it could do so without violating § 38a-816 (10) simply by reimbursing that medical professional in an amount that is far less than he or she could afford to accept in payment. Under the majority's interpretation of § 38a-816 (10), there is absolutely no bar against such conduct by the insurer. Thus, the construction of § 38a-816 that the majority advances would create a loophole rendering meaningless the very protection that the majority itself has identified under the statute.[7] This cannot have been the intent of the legislature. See, e.g., *Hartford Courant Co.* v. *Freedom of Information Commission,* 261 Conn. 86, 101, 801 A.2d 759 (2002) (legislature "[does] not intend to promulgate statutes . . . that lead to absurd consequences or bizarre results" [internal quotation marks omitted]).

Even if the majority were correct in its interpretation of the language of § 38a-816 (10) as barring only denials of reimbursement on the basis of race, color and creed, its construction of the statutory bar against "any unfair discrimination" on the basis of licensure is unpersuasive. Under the majority's construction, the scope of the two provisions of § 38a-816 (10) is precisely the same: the first clause bars the denial of reimbursement on account of race, color and creed, and the second clause bars the denial of reimbursement on account of licensure. The majority, however, does not explain why the legislature would have elected to use entirely different language in the two clauses if it had intended for those provisions to have identical meanings. "Ordinarily, when the legislature uses different language, the legislature intends a different meaning." (Internal quo-

---

[7] Although such discrimination by an insurer on the basis of race, color or creed might not be in that insurer's best financial interest, undoubtedly, an insurer bent on discriminating in that manner would not be deterred from doing so by economic considerations. Indeed, if it were otherwise, there would have been little need for the provision barring discrimination on the basis of race, color or creed.

tation marks omitted.) *Dias* v. *Grady*, 292 Conn. 350, 361, 972 A.2d 715 (2009). This is especially true in view of the fact that the legislature could have achieved the result that the majority attributes to it merely by adding the word "licensure" to the terms "race," "color" and "creed."[8] Instead, the legislature opted for entirely different and much broader language for purposes of the second clause.[9] It is telling that the majority does not even acknowledge this obvious problem with its linguistic analysis.

To support its conclusion, the majority relies on the scant legislative history of § 38a-816 (10). That legislative history is, at best, unhelpful in determining the scope of that provision. For example, in commenting on Public Acts 1967, No. 852, § 1, which is now codified as amended at § 38a-816 (10), and which applied only to chiropractors,[10] Senator John P. Janovic remarked: "[The] act will prohibit an insurance company from denying benefits to a person treated by a chiropractor. It will prohibit insurance companies from discriminating against a chiropractor for services rendered under

[8] The majority appears to suggest that construing § 38a-816 (10) to include unfair discrimination in the setting of reimbursement rates on the basis of licensure somehow renders superfluous the preceding clause barring discrimination on the basis of race, color or creed. Specifically, the majority states that it "cannot interpret" the clause prohibiting unfair discrimination "so broadly that it completely encompasses the meaning of the . . . clause" prohibiting discrimination on the basis of race, color or creed. Because the two clauses target discrimination involving different groups, neither clause renders the other superfluous.

[9] I also note that, as the plaintiffs contend, if § 38a-816 (10) does not prohibit unfair discrimination in the setting of rates, then the protections of the provision are largely, if not entirely, illusory. Under the majority's interpretation, an insurer could reimburse podiatrists at very low rates, thereby effectively denying podiatrists the opportunity to participate in the defendant's network and thwarting the purpose of the statute.

[10] Podiatrists were not included in the protected class of "practitioner[s] of the healing arts"; General Statutes § 38a-816 (10); until 1981. See Public Acts 1981, No. 81-471, § 4 (amending General Statutes [Rev. to 1981] § 20-1 to include podiatry in definition of "[t]he practice of the healing arts").

future insurance contracts." 12 S. Proc., Pt. 5, 1967 Sess., p. 2346. Commenting on a 1969 amendment, Senator George L. Gunther characterized the scope of the protection afforded to practitioners of the healing arts under what is now § 38a-816 (10) as "eliminat[ing] any insurance reimbursement being denied [to] anyone based on race, color, creed, or healing art." Conn. Joint Standing Committee Hearings, Insurance, 1969 Sess., p. 1. These broad, general comments provide no meaningful insight into the precise parameters of the insurance practices barred by § 38a-816 (10), and they certainly cannot be deemed to limit the exceedingly broad statutory prohibition against "*any* unfair discrimination . . . ." (Emphasis added.) General Statutes § 38a-816 (10). Indeed, for the reasons that I have explained, the references in the legislative history to the "deni[al]" of reimbursement on the basis of race, color or creed reasonably cannot be understood as reflecting an intent to limit the scope of the statutory protection to outright or complete denials but, rather, must be read as including *any* denial, either complete or partial, on the basis of race, color or creed.

In sum, the majority's interpretation of § 38a-816 (10) finds insufficient support in the statutory language or in the pertinent legislative history. In view of the fact that the provision's broad prohibition against "any unfair discrimination" on the basis of licensure surely encompasses disparate reimbursement rates *based solely on the license* held by a medical professional and not on the nature or quality of the care provided by that professional, as the plaintiffs allege, the plaintiffs are entitled to their day in court.[11] Cf. *Tallmadge Bros.,*

[11] In support of its contention that the trial court properly granted its motion for summary judgment, the defendant asserts that the different reimbursement rates that it pays to medical doctors and podiatrists cannot constitute unfair discrimination because, as a matter of law, medical doctors and podiatrists are not similarly situated. This argument lacks merit because the plaintiffs have raised a statutory claim, not a claim under the equal protection clause of the fourteenth amendment. See, e.g., *Stuart* v. *Commis-*

*Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 505, 746 A.2d 1277 (2000) (whether acts of defendant constitute unfair trade practices gives rise to question of fact for decision by trier of fact). Because the majority denies them that right, I respectfully dissent.

*sioner of Correction*, 266 Conn. 596, 602 and n.10, 834 A.2d 52 (2003) (equal protection clause of fourteenth amendment applies only upon threshold showing that state statute or practice treats similarly situated persons differently). Moreover, § 38a-816 (10) protects certain practitioners of the healing arts, including podiatrists. To the extent that a claim under § 38a-816 (10) alleging unfair discrimination requires a showing by a plaintiff that the medical services that he or she has rendered were of equal or better quality than the same services provided by a medical professional reimbursed at a higher rate, the determination of whether the plaintiff has made such a showing is one for the trier of fact, not the court.