KAHN, J.
**346 *274 This appeal requires us to determine the appropriate mens rea for the crime of illegal practices in campaign financing. The defendant, Ernest Newton II, appeals from the judgment of conviction, following a jury trial, of three counts of illegal practices in campaign financing in violation of General Statutes §§ 9-622 (7) and 53a-8. The defendant claims that the trial court improperly failed to instruct the jury that, in order to find him guilty of an illegal campaign financing practice in violation of § 9-622 (7), it must find that he acted **347 with specific intent to violate that statute.[1] The state responds that the defendant waived his instructional challenge and, in the alternative, that the trial court properly instructed the jury that the state was required to prove only that the defendant acted with general intent. We conclude that the trial court improperly instructed the jury as to the applicable mens rea for the crime of illegal campaign financing practices. Accordingly, the judgment of the trial court is reversed.
A brief overview of Connecticut's public campaign financing program provides helpful context for considering the issues presented in this appeal. The website for the State Elections Enforcement Commission (Commission) describes Connecticut's public campaign financing program, the Citizens' Election Program (Program), as "a voluntary program which provides full public financing to qualified candidates for [s]tatewide offices and the General Assembly. To participate, candidates must agree to abide by certain guidelines, including contribution and expenditure limits and disclosure requirements. This voluntary public campaign financing program was designed to encourage citizen participation and limit the role of private money in the [s]tate of Connecticut's political process." State Elections Enforcement Commission, Citizens' Election Program, available at http://www.ct.gov/seec/cwp/view.asp?a=3548&Q=489606 (last visited October 11, 2018).
The Program applies to all state elections, including primaries. General Statutes § 9-702 (b). In 2012, the **348 amount of public financing grant money available to a major party candidate who sought the nomination to the office of state senator and who had satisfied all of the Program's prerequisites was $80,550. General Statutes §§ 9-702 (a) (1) and 9-705 (e) (1) and (h). To qualify for a public financing grant, a candidate for state senator must raise at least $15,000 in qualifying contributions, including contributions from at least 300 individuals residing in municipalities included in whole or in part in the candidate's district. General Statutes § 9-704 (a) (3). The maximum qualifying contribution or contributions that any individual may make is $100. General Statutes § 9-704 (a) (3) (A). Individuals who make qualifying contributions of more than $50 must fill out a qualifying contribution certification form (contribution card) that certifies the truth and accuracy of certain statutorily required information. *275 General Statutes §§ 9-608 (c) (3) and 9-704 (b). Candidates who participate in the Program agree to accept campaign expenditure limits, and they are prohibited from raising funds other than through qualifying contributions. General Statutes §§ 9-702 (b) and (c) and 9-704.
The jury could have found the following relevant facts. On January 14, 2012, the defendant registered as a candidate for state senator in the twenty-third district, affiliated with the Democratic party. Because the defendant was "a major party candidate for nomination to the office of state senator," his candidate committee was eligible under the Program for a grant from the citizens' election fund for his primary campaign for the nomination. General Statutes § 9-702 (a) (1). As required by statute, the defendant filed an affidavit of intent to abide by the requirements of the Program. General Statutes § 9-703 (a). In the affidavit of intent, the defendant certified, inter alia, to the following: "I understand that I am required to comply with the requirements of the Program, including all applicable **349 statutes, regulations and declaratory rulings. I certify that I understand that my failure to abide by the requirements of all applicable statutes and regulations relating to the Program may result in the ... imposition of penalties [by the Commission], as provided in [c]hapters 155 and 157 of the ... General Statutes. I certify that I understand that I shall be personally liable for penalties relating to violations of the Program requirements, by myself, my agents, and/or anyone acting under my explicit or implied direction." The following notice appears in bold print at the bottom of the certification form signed and initialed by the defendant: "Making a false statement on this form may subject you to criminal penalties, including, but not limited to, imprisonment, a fine, or both."
On July 9, 2012, Loretta Williams, the treasurer for the defendant's candidate committee, filed the defendant's application for a grant from the citizens' election fund under the Program. In the application, the defendant and Williams both certified that the defendant had received the requisite amount of qualifying contributions. On the same day, Williams filed an itemized campaign finance disclosure statement, which reported that the campaign had raised an aggregate amount of $15,375.
After Williams filed the defendant's application for the grant along with the supporting documentation, the Commission conducted a routine review of the application to confirm that the defendant had complied with the Program requirements. That review revealed that the defendant had raised only $14,410 in qualifying contributions, falling $590 short of the amount necessary to qualify for the grant of $80,550 in public funds. A further review revealed that an additional $100 qualifying contribution had not been counted, and it was determined that the shortfall was actually $490. On July 17, 2012, the defendant was holding a rally at his campaign **350 headquarters. At approximately 4:30 p.m., Williams, who was at the rally, received a telephone call from the Commission informing her of the shortfall and informing her of ways that the campaign could remedy the shortfall and qualify for the grant. When Williams announced the news to the room, the defendant, who had been standing next to her, "threw his hands up in disgust and walked out."
Sometime later that day, Williams discovered $500 in cash on her desk, along with contribution cards certifying that five individuals-Alfredo Serrano, Leeta Reed, Mark Bogues, Vincent Derr and Zena Galberth-had each donated $100 to the campaign. Contrary to the representations on *276 the contribution cards, however, none of the five persons who signed the cards had donated any money at any time to the defendant's campaign. Sometime after Williams announced the campaign's shortfall to the room and before she discovered the cash on her desk, the defendant, either on his own or through the assistance of another, had approached the five signors and instructed them to sign the cards. The defendant assured them that they would not be required to donate money to the campaign. When they were finished signing the cards, they handed them back either to the defendant himself or to someone who was with the defendant.
The following day, the campaign filed documents showing that, on July 17, 2012, it had received five separate $100 cash contributions made in the names of Serrano, Reed, Bogues, Derr and Galberth. Upon receiving the additional filing, the campaign disclosure and audit unit of the Commission submitted a recommendation that the defendant's grant application be approved. As a result of that approval, the defendant **351 received a grant of $80,550.[2] The defendant's campaign ultimately expended all of its grant money. The defendant was not elected to office.
On August 23, 2012, Serrano contacted the Commission to complain that he had not been compensated for work that he had performed for the defendant's campaign. At that time, Serrano also disclosed that he had signed a document stating that he had made a contribution to the campaign when he had not in fact contributed any money. Charles Urso, the lead investigator for the Commission, followed up on the information provided by Serrano and ultimately took statements from all five individuals who had signed contribution cards at the rally on July 17, 2012.
The defendant was subsequently charged with two counts of larceny in the first degree in violation of General Statutes § 53a-122 (a) (2) and (4), and § 53a-8, one count of tampering with a witness in violation of General Statutes § 53a-151, and five counts of illegal practices in campaign financing in violation of §§ 9-622 (7) and 53a-8.[3] Following a jury trial, the defendant was found guilty of three counts of illegal practices in campaign financing and found not guilty of tampering with a witness. The court declared a mistrial as to the **352 remaining counts. The court sentenced the defendant to a total effective sentence of six months imprisonment, with the sentence stayed pending appeal. This appeal followed.[4] Additional facts and procedural history will be set forth as necessary.
The defendant claims that the trial court improperly failed to charge that, in order *277 to find him guilty of an illegal practice in campaign financing in violation of § 9-622 (7), the jury was required to find that he "knowingly and wilfully" violated the statute as provided in General Statutes § 9-623, and that the statutory language, "knowingly and wilfully," denotes that the defendant acted with specific intent. The state contends that we should decline to address this claim because the defendant waived it. In the alternative, the state argues that the trial court's charge correctly instructed the jury that it had to find that the defendant acted with general intent. The defendant responds that his claim is preserved and that he did not waive it. We conclude that the defendant's claim, although unpreserved, was not waived, and is reviewable pursuant to State v. Golding , 213 Conn. 233, 239-40, 567 A.2d 823 (1989). We further conclude that the trial court improperly instructed the jury that in order to find the defendant guilty of the crime of illegal practices in campaign financing, it was required to find that the defendant acted with general intent.
I
As a threshold matter, we address the state's contention that the defendant waived his unpreserved instructional challenge. The defendant's failure to preserve his instructional challenge is clear from the record. He failed to file a request to charge, and he did **353 not take an exception to the charge as given. Under those circumstances, we have held that a claim has not been preserved. See State v. Ramos , 261 Conn. 156, 170, 801 A.2d 788 (2002), overruled in part on other grounds by State v. Elson , 311 Conn. 726, 754-55, 91 A.3d 862 (2014).[5] We have explained that "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation ... exists and ... deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) State v. Golding , supra, 213 Conn. at 239-40, 567 A.2d 823 ; see also In re Yasiel R. , 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third prong of Golding ).
The state claims that the defendant's instructional challenge is unreviewable because he implicitly waived the claim under the rule articulated in **354 State v. Kitchens , 299 Conn. 447, 10 A.3d 942 (2011). Specifically, in Kitchens , we held that, "when *278 the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal. Such a determination by the reviewing court must be based on a close examination of the record and the particular facts and circumstances of each case." Id., at 482-83, 10 A.3d 942. Under the circumstances of the present case, we find no waiver.
The following additional procedural facts are relevant to our resolution of this issue. The court provided the parties with copies of the draft preliminary instructions on January 12, 2015. At that time, the court requested that counsel provide input on areas that the court had marked on the draft and, in particular, solicited feedback from counsel as to whether the applicable mens rea for the crime of illegal practices in campaign financing was general or specific intent. Shortly thereafter, the court reminded counsel that it welcomed any comments on the draft charge. The next day, the court provided counsel with an updated version of the draft and reiterated that they should contact the court with any suggestions for changes to the proposed instructions.
During the charge conference on January 14, 2015, the state took issue with the proposed instruction on the crime of illegal practices in campaign financing on the basis that some of the language in the instruction suggested that specific intent was the applicable mens **355 rea.[6] The state argued that only general intent was required. During the ensuing discussion, both the parties and the court all agreed that, at the very least, the state was required to prove that the defendant had acted knowingly. Defense counsel contended, however, that a jury finding that the defendant had merely acted knowingly would be insufficient to support a conviction. In addition to finding that he acted knowingly, defense counsel argued, the jury was required to find that the defendant had acted with specific intent. The court agreed with the state that the applicable *279 mens rea was general intent, but indicated that it would give further thought to the defendant's position. Upon hearing the court's ruling, defense counsel stated: "All right." At the close of the charge conference, the court instructed counsel that they should contact the court before the next day with any additional issues concerning the charge. **356 The following day, the court instructed the jury on the applicable mens rea consistent with its ruling during the charge conference. Specifically, the court instructed the jury that, as to the third element of the crime of illegal practices in campaign financing, the state had to prove "knowledge of [the] falsity of the payment." The court's instruction provided in relevant part: "The third element is the defendant, as a principal or accessory, knew that the information was false. A person acts knowingly with respect to conduct or circumstances when he is aware that his conduct is of such nature or that such circumstances exist. An act is done knowingly if done voluntarily and purposely, and not because of mistake, inadvertence or accident.
"Ordinarily, knowledge can be established only through an inference from other proven facts and circumstances. The inferences may be drawn if the circumstances are such that a reasonable person of honest intention ... in the situation of the defendant, would have concluded that ... Serrano had not made a campaign contribution. The determinative question is ... whether the circumstances in the particular case form a basis for a sound inference as to the knowledge of the defendant in the transaction under inquiry....
"Conclusion. In summary, the state must prove beyond a reasonable doubt that the defendant ... as either a principal or an accessory, one, either directly, indirectly or through another person, made a payment to the treasurer; two, the payment to the treasurer was in the name, [Serrano], a person other tha[n] the person who provided the payment; and, three, the defendant, as a principal or accessory, knew that the information was false."
After the court finished the charge and excused the jury, it invited counsel to raise any objections to the charge as given. During the ensuing colloquy, defense **357 counsel raised one concern with the charge but did not question the court's instruction that the applicable mens rea for the crime of illegal practices in campaign financing was general intent. The defendant took no exceptions to the charge.
The state claims that, although defense counsel initially requested a specific intent instruction, in light of his subsequent statements and conduct, he implicitly waived any challenge to the court's general intent instruction by "affirmatively accepting" it. Specifically, the state claims that defense counsel abandoned his claim that specific intent was required and "accepted" the general intent instruction by responding, "[a]ll right" when the court rejected his request. As further evidence that defense counsel "affirmatively accepted" the general intent charge, the state points to defense counsel's failure either to file a subsequent request to charge including specific intent language or to reiterate his request for a specific intent charge before the final instruction the following morning. Lastly, the state points out that, when the court gave counsel the opportunity to raise any concerns with the charge after the court had given the final instruction, defense counsel raised an issue but did not object to the general intent instruction, and took no exception to the charge on that basis.
We emphasize that our determination that defense counsel did not waive his *280 instructional challenge is predicated on a close examination of the record and is limited to the particular facts and circumstances of the present case. See State v. Kitchens , supra, 299 Conn. at 482-83, 10 A.3d 942. Under these particular facts and circumstances, we conclude that the words and conduct of defense counsel did not amount to an affirmative acceptance of the court's general intent instruction.[7] At the charge **358 conference, when he responded "[a]ll right" to the court's ruling in favor of the state, defense counsel already had informed the court of his position-that the law required the court to charge the jury that, in order to obtain a conviction of the crime of illegal practices in campaign financing, the state had to prove that the defendant acted with specific intent. Given that particular context, we conclude that the most reasonable reading of defense counsel's statement is that he was merely acknowledging that the court had heard his position and had ruled against him.
This case stands in sharp contrast to State v. Coleman , 304 Conn. 161, 37 A.3d 713 (2012), on which the state relies. In that case, our conclusion that the defendant had waived his instructional challenge on appeal was based on our observations that (1) the defendant had raised a different objection in the trial court than the one he raised on appeal, and (2) as to the objection he did raise at trial, he had suggested a cure that the trial court adopted. Id., at 173-74, 37 A.3d 713. In the present case, the defendant's position on appeal is the same as the one he argued before the trial court-that the court improperly charged the jury that the applicable mens rea was general intent.
We also are not persuaded by the state's argument that defense counsel affirmatively accepted the general intent instruction by failing to reiterate his opposition to the trial court's ruling in the state's favor. For instance, the state relies on defense counsel's failure either to submit a subsequent request to charge including specific intent language or to take an exception to the charge as given. Under the facts of the present case, those failures on the part of defense counsel, although relevant to the preservation of the defendant's claim, do not constitute waiver. The purpose of the Kitchens rule is simply to ensure that defense counsel brings "the specific instructional error to the trial court's attention **359 ...." State v. Kitchens , supra, 299 Conn. at 494 n.27, 10 A.3d 942. Defense counsel in the present case did precisely that. Nothing in our decision in Kitchens requires that, in order to avoid the implicit waiver rule, defense counsel must doggedly and repeatedly pursue an instructional claim that has already been presented to and rejected by the trial court. The defendant's claim was not waived. Accordingly, because the record is adequate and the claim is of constitutional magnitude, we review the defendant's claim pursuant to Golding .
II
We turn to the primary question presented in this appeal, namely, what mens rea the state must prove in order for a jury to find a defendant guilty of the crime of illegal practices in campaign financing. We conclude that, in order to obtain a conviction for a violation of § 9-622 (7), the state must prove that a defendant acted with knowledge *281 that his conduct was unlawful and with the intent to do something the law forbids. It is not necessary, however, for the state to prove that the defendant acted with knowledge that his conduct specifically violated § 9-622 (7). Accordingly, although we disagree with the defendant that the state was required to prove specific intent, we also disagree with the state that the trial court properly instructed the jury that only general intent was required.
"The standard of review for claims of instructional impropriety is well established. [I]ndividual jury instructions should not be judged in artificial isolation ... but must be viewed in the context of the overall charge.... The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law.... Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper **360 verdict ... and not critically dissected in a microscopic search for possible error.... Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury.... In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury.... A challenge to the validity of jury instructions presents a question of law over which [we have] plenary review." (Internal quotation marks omitted.) State v. Campbell , 328 Conn. 444, 528-29, 180 A.3d 882 (2018).
Section 9-622, which sets forth illegal practices in campaign financing, including the particular practice at issue in the present case, provides in relevant part: "The following persons shall be guilty of illegal practices and shall be punished in accordance with the provisions of section 9-623... (7) Any person who, directly or indirectly, individually or through another person, makes a payment or promise of payment to a treasurer in a name other than the person's own, and any treasurer who knowingly receives a payment or promise of payment, or enters or causes the same to be entered in the person's accounts in any other name than that of the person by whom such payment or promise of payment is made ...." Unless a defendant is a campaign treasurer, § 9-622 (7) does not identify the requisite mental state for a violation of the statute. Section 9-623-the penalty provision for § 9-622-defines the mental state for violations of the provisions of § 9-622, including subsection (7). Section 9-623 provides in relevant part: "(a) Any person who knowingly and wilfully violates any provision of this chapter shall be guilty of a class D felony...." (Emphasis added.)
The central question presented in this appeal, therefore, is the meaning of the phrase "knowingly and wilfully"
**361 in § 9-623-or, more precisely, the meaning of the term "wilfully" within that phrase. The meaning of the term "knowingly" is neither problematic nor disputed by the parties. A defendant acts "knowingly" when, as the trial court instructed in the present case, "he is aware that his conduct is of such nature or that such circumstances exist. An act is done knowingly if done voluntarily and purposely, and not because of mistake, inadvertence or accident." The question is whether the word "wilfully," as used in the phrase "knowingly and wilfully," requires that the state prove more than mere knowledge. That question is one of statutory interpretation, over which we exercise plenary review, guided by well established principles regarding legislative intent. See, e.g., Kasica v. Columbia , 309 Conn. 85, 93, 70 A.3d 1 (2013) (explaining plain meaning rule under General Statutes § 1-2z and setting *282 forth process for ascertaining legislative intent).
Although this court has previously considered the meaning of the phrase "knowingly and wilfully" as used in the campaign finance statutory scheme, our interpretation of that phrase predated significant developments in the relevant case law of the United States Supreme Court. In State v. Proto , 203 Conn. 682, 686, 526 A.2d 1297 (1987), the state appealed from the trial court's judgment dismissing the counts charging the defendants with criminal violations of the campaign finance statutes on the basis that the relevant provisions were impermissibly vague. In support of the trial court's judgment, the defendants argued that it was unclear whether the phrase "knowingly and wilfully" denoted a subjective or objective standard for the mens rea. Id., at 704, 526 A.2d 1297. This court rejected that argument on the basis that "[t]he phrase 'knowingly and wilfully' invariably denotes a specific intent, or subjective state of mind." Id., citing Screws v. United States , 325 U.S. 91, 101, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945).
**362 Since Proto was decided, however, the United States Supreme Court has revisited the meaning of the term "knowingly and wilfully" in several seminal decisions and has arrived at a more nuanced, contextual approach to interpreting that phrase. Because those decisions are not reconcilable with our conclusion in Proto that "knowingly and willfully," as used in the campaign finance statutes, denotes specific intent, we now reconsider that conclusion. Most important, more recent decisions of the United States Supreme Court have stated the general rule in a manner completely contrary to our statement in Proto that the term "invariably" denotes specific intent. State v. Proto , supra, 203 Conn. at 704, 526 A.2d 1297. "[T]he term [wilfully] in criminal law generally refers to consciousness of the act but not to consciousness that the act is unlawful." (Internal quotation marks omitted.) Ratzlaf v. United States , 510 U.S. 135, 151, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) (Blackmun, J., dissenting). Significantly, however, although the court has indicated that, as a general rule, it will interpret the term "wilfully" to denote general intent, it has also made clear that the term's meaning will vary depending on the particular statutory scheme, explaining that "wilful" is a "word of many meanings, and its construction [is] often ... influenced by its context." (Internal quotation marks omitted.) Id., at 141, 114 S.Ct. 655.
Because our campaign finance laws are similar to federal campaign finance laws, in interpreting §§ 9-622 (7) and 9-623, we are guided by recent United States Supreme Court decisions construing the term "wilfully." See Nussbaum v. Kimberly Timbers, Ltd. , 271 Conn. 65, 73 n.6, 856 A.2d 364 (2004) ("[i]n construing a Connecticut statute that is similar to federal law, we are guided by federal case law"). Our reliance on federal law is particularly appropriate for interpreting the term "knowingly and wilfully" because our use of that particular phrase in § 9-623 is "patterned after the Federal **363 [Election] Campaign Act of 1971." 23 H.R. Proc., Pt. 15, 1980 Sess., p. 4473, remarks of Representative Chester W. Morgan. See 52 U.S.C. §§ 30109 (d) (1) (A) and 30122 (Supp. III 2015) ("knowingly and [wilfully]" making campaign contribution in name of another person is subject to criminal penalty). Accordingly, we look to the decisions of the federal courts for guidance. We find particularly persuasive the decision of the United States Court of Appeals for the Second Circuit in United States v. George , 386 F.3d 383, 389-93 (2d Cir. 2004), which analyzes the decisions of the United States Supreme Court that have interpreted the meaning of the term "wilfully." *283 In George , the defendant had been convicted of making a false statement in a passport application. Id., at 385. The issue on appeal required the court to construe the meaning of the term " '[wilfuly] and knowingly' " as used in the applicable federal statute, in order to determine the mens rea that applied to the crime. Id., at 388-89. The court began its analysis with the recognition that "[d]ivining the meaning of '[wilfully]' in criminal statutory mens rea terms has long bedeviled American courts." Id., at 389. Ultimately, the court held that, under the applicable statute, 18 U.S.C. § 1542, the phrase "[wilfully] and knowingly" denoted general intent. Id., at 394-95. In other words, a conviction under that statute requires that "a defendant provide in a passport application information he or she knows to be false and does not mandate that the defendant act with a specific purpose to make false statements or to violate the law, either generally or [ 18 U.S.C.] § 1542 specifically." Id., at 389. In the course of its analysis, the court reviewed decisions of the United States Supreme Court that had interpreted the term wilfully as used in different criminal statutes.
Depending on the complexity of the statutory scheme and the risk of criminalizing otherwise innocent conduct, **364 the Second Circuit in George identified three different meanings of "wilfully" in United States Supreme Court jurisprudence: (1) the baseline level of intent, which requires the government to prove only that the defendant's conduct was intentional as distinguished from accidental; id. ; (2) the highest level of intent, which "requires the [g]overnment to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty"; (internal quotation marks omitted) id., at 391 ; and (3) the intermediary level of intent, which does not require the government to prove that the defendant had specific knowledge of the law he is charged with violating, but does require the government to prove that the defendant "acted with knowledge that his conduct was unlawful." (Internal quotation marks omitted.) Id., at 392.
The court concluded that the first, baseline meaning applied under the facts presented in George . Relying on Browder v. United States , 312 U.S. 335, 342, 61 S.Ct. 599, 85 L.Ed. 862 (1941), which had construed "wilfully" as used in the same statute that was at issue in George , the court in George interpreted the term "wilfully" to signify general intent. So construed, "wilfully" denotes "an intentional as distinguished from an accidental act," one that is undertaken "deliberately and with knowledge and not something which is merely careless or negligent or inadvertent." (Internal quotation marks omitted.) United States v. George , supra, 386 F.3d at 389. In Browder , the court explained that the requirement of merely general intent was appropriate given the fairly straightforward statutory language. Browder v. United States , supra, at 340-41, 61 S.Ct. 599.
The second meaning of "wilfully" identified by George is the most stringent standard of specific intent, which would require the government to prove that a defendant acted with knowledge not only that his conduct was **365 unlawful, but also that he knew that the law imposed a specific duty on him and that his conduct violated that specific duty. See Cheek v. United States , 498 U.S. 192, 201, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). In other words, this highest level of intent requires that a defendant act with knowledge of the statutory requirement and have a specific intent to violate the statute. Ratzlaf v. United States , supra, 510 U.S. at 141, 114 S.Ct. 655. The Second Circuit observed in George that the United *284 States Supreme Court "has read '[wilfully]' to require such specific intent only when those activities classified as illegal do not on their own provide notice of their criminality, either because of the difficulty of comprehending the legally acceptable parameters of the activity or because the criminal actus reus can often be undertaken with a lawful purpose." United States v. George , supra, 386 F.3d at 390. See, e.g., Ratzlaf v. United States , supra, at 144, 114 S.Ct. 655 (requiring specific intent for violation of antistructuring banking regulation on basis that imposition of merely general intent would risk criminalizing otherwise innocent conduct); Cheek v. United States , supra, at 200, 111 S.Ct. 604 (requiring specific intent on basis of complexity of tax laws and attendant risk of criminalizing innocent conduct if traditional rule of requiring only general intent is applied).
The third meaning of "wilfully"-an "intermediate" level of intent-is exemplified by the decision of the Supreme Court in Bryan v. United States , 524 U.S. 184, 195-96, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998). See United States v. George , supra, 386 F.3d at 391. In Bryan , the Supreme Court "declined to apply the stricter interpretation of '[wilfully]' (established by Cheek and Ratzlaf ) to create additional exceptions to the criminal law maxim that ignorance of the law is no defense to crime, but nevertheless still required the defendant to possess some knowledge of the illegality of his or her conduct." Id. The court in Bryan construed the term "wilfully,"
**366 as used in provisions regulating the use and sale of firearms, to signify something more than general intent, but falling short of the most stringent form of specific intent. Bryan v. United States , supra, at 187, 193, 118 S.Ct. 1939. Specifically, in order to obtain a conviction, the government was required to prove that the defendant acted with knowledge that his conduct was generally unlawful, but was not required to prove that the defendant knew of the specific licensing requirement that he was charged with violating. Id., at 198, 118 S.Ct. 1939. The court explained that the more stringent mens rea was appropriate in Cheek and Ratzlaf because, unlike the statutory scheme at issue in Bryan , the statutes at issue in those cases were "highly technical statutes that presented the danger of ensnaring individuals engaged in apparently innocent conduct." Id., at 194, 118 S.Ct. 1939. In addition, the court observed, in the statutes at issue in Bryan , there was "no danger of conviction of a defendant with an innocent state of mind." Id., at 195 n.22, 118 S.Ct. 1939.
In concluding that the term "wilfully" denoted more than mere general intent, the court in Bryan relied primarily on the fact that in the statute at issue in the case, 18 U.S.C. § 924, the different statutory subsections impose criminal liability for different acts depending on whether those acts were performed either "knowingly" or "wilfully." Id., at 193, 118 S.Ct. 1939. Specifically, title 18 of the United States Code, § 924 (a) (1) (A), (B) and (C), predicates criminal liability on violating the relevant substantive provisions "knowingly," whereas 18 U.S.C. § 924 (a) (1) (D), the particular subparagraph at issue in Bryan , requires that a violation be "wilful" in order to give rise to criminal liability. The court inferred that, because 18 U.S.C. § 924 (a) (1) (D) uses wilfully, as opposed to knowingly, with respect to violations of the provisions governed by that subparagraph, the two levels of intent must differ. Bryan v. United States , supra, 524 U.S. at 193, 118 S.Ct. 1939. Accordingly, for a violation of **367 18 U.S.C. § 924 (a) (1) (D), the government was required to prove more than simply knowledge of the underlying circumstances. The government also was required to prove that the defendant "acted *285 with knowledge that his conduct was unlawful." Id.
The remaining question in the present appeal is which of the three levels of intent is the correct standard for the term "wilfully" as used in §§ 9-622 (7) and 9-623. Although there are no Second Circuit cases analyzing the proper mens rea in the context of campaign financing statutes, federal district courts in other circuits have applied the George analytical framework in addressing this issue. In doing so, those courts have concluded that the intermediate meaning of "wilfulness" is the appropriate mens rea for violations of the federal campaign finance statutes that use substantially the same language as § 9-623, i.e., "knowingly and wilfully." See United States v. Whittemore , 944 F.Supp.2d 1003, 1007 (D. Nev. 2013), aff'd, 776 F.3d 1074 (9th Cir.), cert. denied, --- U.S. ----, 136 S.Ct. 89, 193 L.Ed.2d 35 (2015) ; United States v. Danielczyk , 788 F.Supp.2d 472, 491 (E.D. Va. 2011), rev'd in part on other grounds, 683 F.3d 611 (4th Cir. 2012), cert. denied, 568 U.S. 1193, 133 S.Ct. 1459, 185 L.Ed.2d 362 (2013).
The reasoning of the District Court in Danielczyk is particularly instructive. That case involved charges that the defendant had made campaign contributions in the name of another in violation of 2 U.S.C. § 441f and 18 U.S.C. § 2. United States v. Danielczyk , supra, 788 F. Supp. 2d at 476. Rejecting the argument that the highest level of intent should apply, the court observed that, by comparison with the tax code and the antistructuring regulation that was at issue in Cheek and Ratzlaf , campaign finance laws "are more intuitive and less complex." Id., at 490. The court explained: "Campaign contributions laws are not so complex or surprising that the average citizen would likely be trapped by **368 them." Id. On the defendants' subsequent motion for reconsideration, the court adhered to its original view and offered an additional explanation as to why the highest level of intent was not required in this context. United States v. Danielczyk , 917 F.Supp.2d 573, 578 (E.D. Va. 2013). Specifically, the court explained that, although campaign finance statutes are at least somewhat complex, the same may be said of many statutory schemes. If the court were too readily concluding that the highest level of intent is required on the basis of complexity, it would risk making the exception the rule. Id.
The court also rejected the government's argument that only general intent was required. Notwithstanding the court's earlier observation that there was only a low risk that the average citizen would be "trapped" by the campaign finance laws, it acknowledged that it was at least possible that innocent conduct could be criminalized if the court interpreted "wilful" to denote the baseline level of general intent. United States v. Danielczyk , supra, 788 F. Supp. 2d at 490-91. As to this issue, the court found persuasive a hypothetical offered by the defendants: Suppose a proud parent of a politically active college student reimbursed that student for the purchase of a ticket to a political fundraiser because the parent believed that otherwise she would be unable to afford the price of attendance. Id., at 483. If the term "wilful" were to be interpreted to signify that only general intent is required, the parent's conduct would be criminalized because the actual contributor is the parent, not the child. This is so because, although "the parent reimbursing his daughter's fundraiser ticket is not intuitively 'bad' ... his actions would meet the actus reus" for the applicable campaign finance statute. Id., at 491. Accordingly, the court reasoned, the baseline level of general intent would not strike the proper balance and the intermediate level was required. That is, **369 in order to be found guilty of violating the *286 federal campaign finance laws, the government was required to prove that the defendants "intended to violate the law (whatever the law was); but it [did not need to] prove [the] [d]efendants' awareness of the specific law's commands." Id.
We agree with the federal courts that interpreting the term "wilful" in the campaign finance laws to denote the intermediate level of intent strikes the proper balance.[8] That is, the intermediate level gives proper effect to the fact that, although the campaign finance laws are somewhat complex, the risk that the application of general intent would criminalize innocent conduct, while low, is not impossible. This level of intent is particularly appropriate given the language of §§ 9-622 (7) and 9-623. Specifically, § 9-622 (7) provides that a campaign treasurer is liable for "knowingly" receiving a payment to the campaign in a name other than the person making the payment. As to any person other than the campaign treasurer, however, criminal liability requires that such receipt be made "knowingly and wilfully" pursuant to § 9-623.[9] The different statutory language describing the **370 level of intent supports our conclusion that "knowingly and wilfully" in § 9-623 is more than mere knowledge of the act. See Bryan v. United States , supra, 524 U.S. at 193, 118 S.Ct. 1939 (drawing similar inference on basis of different mens rea language in different statutory subparagraphs). Accordingly, in the present case, the court was required to instruct the jury that, in order to obtain a conviction pursuant to § 9-622 (7), the state was required to prove the intermediate level of intent-that the defendant knew what he was doing, intended to do it, and he knew that his conduct was unlawful.[10]
Consistent with our conclusion that the intermediate level of intent applies, the court was required to instruct the jury as follows: "The ... final element that the [state] must prove ... is that the defendant acted knowingly and [wilfully]. A person acts knowingly if he acts intentionally and voluntarily and not because of ignorance, mistake, accident, or carelessness. [Wilfully] means to act with knowledge that one's conduct is unlawful and with the intent to do something that the law forbids. That is to say, with a bad purpose, either to disobey or disregard the law. The defendant's conduct was not [wilful] if it was due to negligence, inadvertence, or mistake. However, it is not necessary for *287 the [state] to prove that the defendant knew the precise terms of the statute or regulatory provision he is charged with violating-that is, the [state] is not required to prove that the defendant knew the existence of the details of [ §§ 9-622 (7) and 9-623 ] or the related regulations. All that is required is that the [state] prove that the defendant acted with the intent to disobey or disregard the law." United States v. Henry , 888 F.3d 589, 599 (2d Cir. 2018) ; see also id. (approving instruction **371 as to intermediate level in case involving alleged violation of Arms Export Control Act, 22 U.S.C. § 2778 ).
In the present case, the instruction that the trial court gave, which is set forth in part I of this opinion, only requires knowledge of the falsity of the payment and not knowledge that the defendant's own conduct was unlawful-that is to say, with a bad purpose to disobey or disregard the law. The jury, therefore, was not properly instructed regarding the applicable mens rea for the crime of illegal practices in campaign financing, and we conclude that it is reasonably possible that the jury was misled. Moreover, because the incorrect instruction pertains to an element of the offense, and because there is no evidence in the record that the omitted element was uncontested, harmless error analysis does not apply.[11] See, e.g., Epps v. Commissioner of Correction , 327 Conn. 482, 485 n.4, 175 A.3d 558 (2018) (reviewing court applies harmless error review for instruction improperly omitting element of offense only if court is satisfied "beyond a reasonable doubt that **372 the omitted element was uncontested and supported by overwhelming evidence , such that the jury verdict would have been the same absent the error" [emphasis altered; internal quotation marks omitted] ).
The judgment is reversed and the case is remanded for a new trial.
In this opinion the other justices concurred.

The defendant also claims that the trial court improperly violated his right to present a defense by excluding a bank statement of one of his witnesses offered to show that the witness could not have supplied $500 in cash for the illegal campaign contributions. The state responds that the trial court did not abuse its discretion in excluding the bank statement on the basis that the defendant had failed to establish its relevance at the time of the proffer. Because we reverse the trial court's judgment on the basis of the defendant's instructional challenge, we need not resolve the question of whether the trial court properly excluded the bank statement.

The actual amount disbursed to the defendant was $80,805. That amount included an adjustment of $255 to correct for an overpayment made by the defendant's committee to the Commission. Specifically, because the defendant's committee reported that it raised $15,140, the committee was required to remit the excess $140 to the Commission prior to receiving the grant money. The committee mistakenly overpaid by $255, remitting payment to the Commission of $395.

We observe that the long form information does not cite General Statutes § 9-623 in connection with the counts charging the defendant with illegal practices in campaign financing. Although the defendant speculates that this omission in the long form information could have caused the trial court's failure to instruct the jury that the defendant must have acted "wilfully" in order to be found guilty of illegal practices in campaign financing, the defendant does not ground his appeal on a claim that the information was deficient.

The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

We observe that the state relies on the defendant's failure to invoke Golding by name to urge that we decline to review the defendant's instructional challenge. This court, however, has expressly rejected the notion that a defendant's entitlement to Golding review should be predicated on an affirmative request for such review. State v. Elson , 311 Conn. 726, 754-55, 91 A.3d 862 (2014) (overruling in part State v. Ramos , supra, 261 Conn. at 156, 801 A.2d 788, and its progeny). In Elson , we overruled a line of cases that had required precisely what the state suggests we should require of the defendant in the present case-to secure Golding review, a defendant must affirmatively request such review. State v. Elson , supra, at 730, 754-55, 91 A.3d 862. We clarified that, "to obtain review of an unpreserved claim pursuant to State v. Golding , supra, 213 Conn. at 239-40, 567 A.2d 823, a defendant need only raise that claim in his main brief, wherein he must present a record that is [adequate] for review and affirmatively [demonstrate] that his claim is indeed a violation of a fundamental constitutional right." (Internal quotation marks omitted.) State v. Elson , supra, at 754-55, 91 A.3d 862. In the present case, the defendant has met those requirements.

As of the date of the charge conference, the court's proposed draft instruction as to the mens rea for the crime of illegal campaign financing practices (given with the first count, then incorporated by reference in the remaining counts) provided in relevant part: "The third element is the defendant, as a principal or accessory, knew that the information was false. A person acts 'knowingly' with respect to conduct or circumstances when he is aware that his conduct is of such nature or that such circumstances exist. An act is done knowingly if done voluntarily and purposely, and not because of mistake, inadvertence or accident.
"Ordinarily, knowledge can be established only through an inference from other proven facts and circumstances. The inference may be drawn if the circumstances are such that a reasonable person of honest intention, in the situation of the defendant, would have concluded that ... Serrano had not made a campaign contribution. The determinative question is whether the circumstances in the particular case form a basis for a sound inference as to the knowledge of the defendant in the transaction under inquiry....
"The fourth element is that the defendant intended to deprive the public community of the value of the claim. To intend to deprive another of property means to intend to withhold or keep or cause it to be withheld from another permanently, or for so long a period or under such circumstances that the major portion of its value is lost to that person. In other words, the state must prove beyond a reasonable doubt that the defendant took the property for the purpose of keeping or using it permanently or virtually permanently, or of disposing of the property in such a way that there was a permanent or virtually permanent loss of the property to the owner."

Because we conclude that defense counsel did not affirmatively accept the instruction, we need not review the other Kitchens factors.

We are not persuaded by the defendant's reliance on United States v. Curran , 20 F.3d 560 (3d Cir. 1994), for the proposition that we should interpret "wilful" in § 9-623 to denote the highest level of intent. As the state correctly points out, Curran did not involve an interpretation of the federal campaign finance laws and is therefore inapposite.

We recognize that it is peculiar that only the campaign treasurer, and not the candidate, is held to the higher standard. As §§ 9-622 (7) and 9-623 are presently worded, the most reasonable inference is that the legislature intended that a candidate be held to the same standard as any member of the public. Certainly, public policy principles would counsel otherwise. Regardless of our view that the better approach would be to apply the criminal penalty to a candidate who "knowingly" receives a payment in a name other than the name of the person by whom such payment is made, "restraint counsels us to commend the issue to the attention of the legislature for further review, as is appropriate. We consistently have held that the task of changing the law lies with the legislature, and not with the judiciary." (Internal quotation marks omitted.) Connecticut Podiatric Medical Assn. v. Health Net of Connecticut, Inc. , 302 Conn. 464, 473 n.6, 28 A.3d 958 (2011).

We emphasize that the court was not required to instruct the jury that, in order to obtain a conviction, the state was required to prove that the defendant acted with the specific intent to violate § 9-622 (7).

The state contends that, because "the defendant's knowledge of the law was never an issue at trial," the defendant's mens rea was uncontested, and, therefore, the instructional error was harmless. As support for its claim that the defendant's mens rea was uncontested, the state points out that the defendant's theory of defense was that he played no part in soliciting the contribution cards. In other words, rather than arguing that he did not know it was illegal to ask persons to falsely claim that they made contributions to his campaign, the defendant claimed that he had nothing at all to do with the contributions.
For two reasons, we are not persuaded by the state's argument. First, it ignores the principle that the state bears the burden to prove beyond a reasonable doubt that the defendant had the requisite mens rea. Given that allocation of the burden, the mens rea is always contested, unless a defendant concedes that he had the requisite mens rea. In fact, because the state always must prove all of the elements of an offense, the defendant has no obligation to affirmatively contest an element-at the end of the state's case, he may elect to hold the state to its burden. That strategic decision does not mean that the defendant has conceded any element of the offense. Second, implicit in a general defense of nonparticipation in criminal activity is the claim of lack of intent to engage in that conduct.